131 P.3d 305 (2006)
156 Wash.2d 653
Paul TRUMMEL, Petitioner,
v.
Stephen MITCHELL, Respondent.
Stephen Mitchell, in his representative capacity as administrator of Council House, on behalf of the residents, employees, and Board of Directors of Council House; and Council House, Inc., Cross-petitioners,
v.
Paul Trummel, Respondent.
No. 75977-4.
Supreme Court of Washington, En Banc.
Argued June 23, 2005.
Decided March 30, 2006.
*307 Eric Broman, Nielsen Broman & Koch PLLC, William John Crittenden, Elena Luisa Garella, Attorney at Law, Seattle, WA, for Petitioner.
Richard Allan Dubey, Beth Prieve Gordie, Paul J. Dayton and Leslie C. Clark, Short, Cressman & Burgess, PLLC, Seattle, WA, for Respondent.
Aaron Hugh Caplan, Attorney at Law, ACLU of Washington, Seattle, WA, for Amicus Curiae on behalf of ACLU.
Patrick Denis Brown, Attorney at Law, Seattle, WA, for Amicus Curiae on behalf of American Society of Journalists and Authors and National Union of Journalists/London Freelance Branch.
Michele Lynn Earl-Hubbard, Davis Wright Tremaine LLP, Seattle, WA, for Amicus Curiae on behalf of Seattle Weekly.
MADSEN, J.
¶ 1 Petitioner Paul Trummel challenges the Court of Appeal's decision upholding the trial court's antiharassment orders against Trummel brought by respondents Stephen Mitchell on behalf of himself and Council House, Inc., as well as the trial court's multiple findings of civil contempt. We conclude that the trial court did not err in issuing the first antiharassment order providing a no contact zone around Mitchell and Council House. However, we also conclude that the trial court abused its discretion in restraining Trummel from contacting nonparties off premises and in adding content restrictions to the original antiharassment order. Lastly, we conclude that the trial court erred in finding Trummel in contempt. We affirm in part and reverse in part the Court of Appeals.

FACTS
¶ 2 Council House, Inc., is a nonprofit housing complex for low-income senior citizens located on Capitol Hill in Seattle, Washington. Council House is home to approximately 160 adult tenants who live independently in their own apartments, sharing common areas such as a dining hall, activity rooms, and laundry rooms. Council House was built in part using federal funds from the United States Department of Housing and Urban Development. Mitchell is the administrator for Council House. His position requires him to take actions reasonably necessary to maintain the safety and welfare of the residents and staff of Council House.
¶ 3 In November 1998, Trummel moved into Council House. On March 5, 2001, approximately 16 months later, Trummel petitioned the superior court for an antiharassment order against Mitchell. On March 6, 2001, Trummel amended his petition adding specific acts of harassment alleging in part that Mitchell encouraged residents to make noise at night, entered Trummel's apartment without his consent, and threatened Trummel with eviction if he did not cease publication of his newsletter. Trummel obtained a temporary order against Mitchell on March 6, 2001. After a hearing on March 20, 2001, Judge James A. Doerty denied Trummel's petition for a permanent order with prejudice but retained jurisdiction over Mitchell's cross-petition for an antiharassment order against Trummel made at the hearing. Mitchell and over 40 residents and staff at Council House filed declarations detailing Trummel's behavior in support of Mitchell's petition.
¶ 4 A number of the residents described being alarmed by the newsletters written by *308 Trummel and by Trummel's placing the newsletters on their apartment doors against their wishes. Residents and staff also chronicled numerous incidents in which Trummel verbally accosted Mitchell and other residents, yelling and screaming profanities at them and using terms such as "disgusting runt," "racist," and "diabolical woman." Residents stated that they no longer attend resident meetings because of Trummel's disruptive conduct which included yelling during the meetings, taping the meetings, and instigating fights among residents. Residents also stated that Trummel spied on them at night, listening outside their apartment doors. A number of the women residents stated that they no longer felt comfortable entering common areas of the buildings, such as elevators, the laundry room, and the library because they feared encountering Trummel.
¶ 5 The record also contains allegations that Trummel repeatedly contacted a Council House staff member's undergraduate school, former professors, and former residences against the staff member's wishes and, with regards to another staff member, contacted the coroner's office after the staff person's aunt passed away. Trummel also delivered letters (included in the record) to other residents in which Trummel demanded that they meet with him (including a 91 year old woman), threatening to report them to criminal authorities if they refused to so do.
¶ 6 On April 19, 2001, Judge Doerty granted Mitchell's cross-petition. In finding that Trummel committed unlawful harassment, within the meaning of RCW 10.14.020, Judge Doerty concluded:
There is no question in this Court's mind whether the burden of proof is a preponderance of the evidence, beyond a reasonable doubt, or clear, cogent, and convincing [evidence] that Mr. Trummel has engaged in knowing and willful course of conduct directed at specific persons within Council House, both staff and residents which is seriously alarming, annoying, harassing. It is detrimental to those people and it serves no legitimate or lawful purpose.
Report of Proceedings (RP) (Apr. 19, 2001) at 15. In his oral ruling, Judge Doerty identified a number of the staff's and residents' declarations (but not all) on which he specifically relied, many alleging that Trummel had yelled at the staff and residents, spied on them, frightened them, made them afraid to attend meetings and travel in common areas at Council House.[1] In some of the declarations residents quoted from the newsletter or made reference to it. However, the actual newsletters formed only a small part of the record considered by the trial court.
¶ 7 The antiharassment order issued by the trial court (the "original antiharassment order") provided that:
1.1 Respondent [Trummel] is RESTRAINED from:
(a) Making any attempts to contact the petitioner.
(b) Making any attempts to keep the petitioner under surveillance.
(c) Going within 1,000 feet of the petitioner's residence and workplace.
1.2 Other relief ordered:
Paul Trummel is restrained from entering the premises known as Council House, 1501 17th Avenue, Seattle, King County, Washington or coming within 500 feet thereof. Paul Trummel is also restrained from contacting in person, by mail, electronically, by telephone, by writing, or through any third person, any resident of Council House and any board member, staff or employee of Council House at any location.
Clerk's Papers (CP) at 126. As the judge noted, this order effectively evicted Trummel from Council House. The court concluded that the restrictions were necessary, however, because Trummel's conduct had essentially made living at Council House unbearable for many of the 160 residents.[2]
*309 Pursuant to RCW 10.14.080(4), the order is permanent. Five months later, on September 19, 2001, Mitchell brought a motion for finding of civil contempt for violation of the antiharassment order. Mitchell alleged Trummel violated the surveillance provision of the antiharassment order by posting stories on the Internet about events at the Council House.
¶ 8 Specifically, Mitchell contended that Council House staff and residents felt endangered by Trummel's recent postings on his web site, containing publication of their private information and alleging affiliation with Islamic terrorists, and felt under continued surveillance by Trummel.[3] Mitchell said that he and Council House residents and staff were afraid that Trummel's false allegations combined with their home addresses may subject them to direct or indirect harmful acts taken on the basis of Trummel's allegations. Mitchell's counsel attached copies of three articles from Trummel's web site as evidence. In his defense, Trummel argued that Mitchell's definition of surveillance was too broad and that he was merely exercising his First Amendment rights to speak when posting articles about events at the Council House, occurring both before and after the antiharassment order was issued, to his web site.
¶ 9 On October 1, 2001, Judge Doerty found Trummel in civil contempt.[4] All parties attended the hearing, represented by counsel. Trummel was ordered to immediately edit his web site "to assure that it is in compliance with the April 19, 2001 antiharassment order." CP at 325. Trummel was required to "at a minimum" delete the "names, addresses and any other personal information regarding past and present Council House staff, residents, employees, board members, or agents including legal counsel, except for those who waive application of this order to Mr. Trummel in writing" from his web site.[5] CP at 325-26. Failure to comply with the order (purge the contempt) by midnight on October 1, 2001, would result in a $100 fine per day until the site was edited as specified. The court ordered a compliance review, with parties present, on October 5, 2001. At the review hearing, the court was to consider what modifications were appropriate to the original antiharassment order pursuant to RCW 10.14.180. The court also awarded Council House and Mitchell attorney fees for the show cause hearing and the review hearing based on intransigence, which included failing *310 to respond to a letter sent by Mitchell's counsel to Trummel's attorney.
¶ 10 On October 5, 2001, at the compliance review hearing, the court found that Trummel continued to be in contempt pursuant to RCW 7.21.010(1)(b). Although ordered to attend, Trummel did not attend the hearing. However, Trummel was represented by counsel at the hearing. The court continued the compliance review until October 26, 2001.
¶ 11 On October 26, 2001, the court held another compliance hearing. All parties attended and were represented by counsel. The trial court modified the original harassment order (the second antiharassment order), adding language restraining Trummel from "attempting to keep under surveillance" any current or former resident of Council House, any board member, staff, or employee of Council House at any location. CP at 588. In the original order, Trummel was prohibited only from "contacting" these people. Id. at 126.
¶ 12 Additionally, Trummel was restrained from "[p]osting to the Internet or his web site, directly or indirectly, any personal identifying information including, but not limited to the name, address, phone number, social security number, or photograph, of any current, former or future staff member, resident, Board member, or agent, including attorneys, of Council House." Id. at 588. This restraint could be waived by any of the individuals described in the order by providing Trummel with a written waiver which Trummel was required to file with the court prior to posting the information. Trummel apparently deleted the identifying information from his web site shortly after the hearing, purging the contempt.
¶ 13 During the next four months Trummel began using an off-shore web site to post information about the staff and residents. On February 27, 2002, after another hearing, the trial court found Trummel in civil contempt again, this time based on postings on his off-shore web site. At the hearing, Trummel took the position that because he posted personal information about Council House staff and residents on a European web site, the court had no jurisdiction. Finding that lesser sanctions of fines, warnings of incarceration, and regular court monitoring failed to coerce compliance, the court ordered Trummel to be detained in jail until he complied with the order dated October 26, 2001, the second antiharassment order. At this contempt hearing, unlike the three prior hearings, Trummel was not represented by counsel. Trummel's previous private counsel withdrew from representing Trummel at the trial level shortly before the February 27, 2002, hearing, continuing to represent Trummel only on appeal of the prior orders and contempt findings. Trummel announced at this hearing that he was representing himself pro se and provided an affidavit of indigency to be used for appeal purposes.
¶ 14 Trummel refused to modify his offshore web site and remained in jail for almost four months. The trial court, sua sponte, appointed state-funded counsel for Trummel in May 2002. On June 21, 2002, the trial court modified the antiharassment order a final time (the third antiharassment order). In addition to the restrictions in the prior orders, Trummel was restrained from "[i]ntentionally or knowingly going within 100 feet of any past, current or future Council House Board member, resident, or employee." CP at 565. The court also replaced the prior 500 foot no contact zone around Council House with a map, providing a "bright line," which took into account the places that Trummel commonly visited (e.g., medical facilities, residences, and meeting places). RP (June 21, 2002) at 25-27.
¶ 15 Through three different attorneys, two private and one state-appointed, Trummel made numerous motions to reconsider the antiharassment orders and to vacate findings of contempt. The trial court denied all of them. Trummel appealed to the Court of Appeals. The Court of Appeals found no error in any of the antiharassment orders, found no constitutional violations, and refused to vacate any of the findings of contempt.
¶ 16 Trummel petitioned this court for review, which we granted. Three amicus briefs were submitted, by the American Civil Liberties Union (ACLU), Seattle Weekly, and American Society of Journalists and Authors/National *311 Union of Journalists/London Freelance Branch.

ANALYSIS
¶ 17 Trummel contends that the trial court erred in issuing the original antiharassment order. Trummel first contends that the trial court erred in considering declarations provided by the residents of Council House because only Mitchell and Council House are respondents. It is undisputed that counsel for Mitchell and Council House do not represent any of the residents of Council House.[6] Trummel relies on Burchell v. Thibault, 74 Wash.App. 517, 874 P.2d 196 (1994), for the proposition that a person who is not himself the specific target of the harassment cannot seek an antiharassment order.[7]
¶ 18 Trummel also claims that a court can issue an antiharassment order only if the course of conduct is directed at a single person, not at a group of people. RCW 10.14.020(1) provides that "unlawful harassment" means a knowing and willful course of conduct directed "at a specific person," which seriously alarms, annoys, harasses, or is detrimental to such person, and which serves no legitimate or lawful purpose. The course of conduct shall be such as would cause a reasonable person to suffer substantial emotional distress and shall actually cause substantial emotional distress to the petitioner. Id. RCW 10.14.020(2) defines "course of conduct" to mean a pattern of conduct, composed of a series of acts over a period of time, however short, evidencing a continuity of purpose. "Course of conduct" includes, in addition to any other form of communication, contact, or conduct, the sending of electronic communication. Id. Constitutionally protected activity is not included within the meaning of "course of conduct." Id.
¶ 19 In response to Trummel's claims, Mitchell argues that Trummel did not timely object to the declarations of persons not named as petitioners. If Trummel had objected, Mitchell says that he could have easily added the residents as parties. Mitchell claims that a court is entitled to reach the merits of controversies even if "the real parties in interest" are not specifically named, citing Eastlake Constr. Co. v. Hess, 33 Wash. App. 378, 655 P.2d 1160 (1982). Mitchell also claims that Burchell is not on point. In that case, the petitioner was accompanying a visiting religious figure who was being followed during a short visit. Burchell, 74 Wash.App. 517, 874 P.2d 196. The court concluded that the petitioner could not bring a cause of action because none of the harassing behavior was directed at the petitioner and the actual target did not file a complaint or appear to testify. Id.
¶ 20 In contrast, in this case, Mitchell contends that he personally was a victim, in addition to the residents and staff of Council House. The record supports Mitchell. Additionally, unlike in Burchell, many of the Council House residents and staff submitted declarations and attended the hearing. Mitchell then points to State v. Noah, 103 Wash.App. 29, 9 P.3d 858 (2000), and Bering v. Share, 106 Wash.2d 212, 721 P.2d 918 (1986), for the proposition that courts have broad powers to address harassing conduct, not limited by a narrow reading of the statutory provisions.
¶ 21 In Noah, a therapist petitioned the court for an antiharassment order against a person who protested outside the therapist's office, causing emotional distress to both the petitioner and his patients. In issuing the order, the trial court considered the impact of the protestor's behavior on the petitioner as well as on the patients who were not *312 parties. Noah, 103 Wash.App. 29, 9 P.3d 858. Similarly, in Bering, a group of doctors and the owner of the building brought suit to restrain protestors. In granting relief, the trial court considered the impact on the doctors, the petitioners, as well as on the patients, staff, and building visitors. Bering, 106 Wash.2d 212, 721 P.2d 918. In that case, the court found that the picketers' conduct had given rise to a clear and present danger to patients and physicians and that the picketers' conduct was incompatible with the character and function of the medical building. Id. at 223, 721 P.2d 918.
¶ 22 As in both Noah and Bering, Mitchell brought suit to prevent the impact of harassing behavior on himself and the other people to whom he had a relationship. As the administrator in charge of the building, Mitchell's position of employment requires him to ensure the safety of the tenants. The relationship Mitchell has with Council House's residents is similar to the relationship in Noah and Bering that a doctor or therapist has with his or her patients. Additionally, to the extent the tenants are faced with ongoing harassment, they rightly complain to Mitchell, withdraw from activities, and/or move out making his job more difficult, increasing the emotional abuse suffered by Mitchell. Thus, we conclude that the trial court did not err in considering evidence of harassment submitted by the residents of Council House who are not themselves parties to the proceedings.
¶ 23 Trummel argues though, that even if evidence from nonparties can be considered, there was insufficient evidence for the trial court to find harassment. RCW 10.14.020(2) provides that "[c]onstitutionally protected activity is not included within the meaning of `course of conduct'." RCW 10.14.190 provides that "[n]othing in this chapter shall be construed to infringe upon constitutionally protected rights including, but not limited to, freedom of speech and freedom of assembly."
¶ 24 Trummel contends that Mitchell's claims were based entirely on constitutionally protected activities. He cites several cases as authority for his argument that the following activities in which he engaged are constitutionally protected: publishing (citing N.Y. Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)); speaking (citing Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969)); leafleting (citing United States v. Grace, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)); complaining to government agencies (citing Richmond v. Thompson, 130 Wash.2d 368, 922 P.2d 1343 (1996)); and use of the courts (citing City of Seattle v. Megrey, 93 Wash.App. 391, 968 P.2d 900 (1998)). Similarly, Trummel claims that the content of his newsletters is at the heart of the residents' complaints and that content is constitutionally protected unless the newsletters contain narrow categories of unprotected speech (e.g., fighting words, true threats, defamation). See, e.g., In re Marriage of Suggs, 152 Wash.2d 74, 93 P.3d 161 (2004). As to resident complaints that Trummel forced his newsletters on them, Trummel claims that he has a constitutional right to give his newsletters to residents even if they do not want to receive them, citing Martin v. Struthers, 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313 (1943).
¶ 25 In response, Mitchell claims that the trial court correctly relied on Trummel's predatory behavior directed at Council House staff and residents  not on the content of the newsletters or other constitutionally protected activity in issuing the antiharassment order. Mitchell contends that the factual record is replete with examples of Trummel's predatory behavior directed at Council House residents and staff.
¶ 26 Mitchell is correct. While a number of residents did complain about the content of Trummel's newsletters, the record contains substantial evidence relating to Trummel's conduct, which has little or no free speech protections. Moreover, none of the cases cited by Trummel provide constitutional protection for his predatory conduct, which included yelling and screaming at staff and residents, disrupting meetings, spying on residents, and threatening residents with criminal consequences if they failed to meet with him. Excerpts of declarations relied upon by the trial court in making its finding under RCW 10.14.020(2) show that Trummel committed "a pattern of conduct composed of *313 a series of acts over a period of time, however short, evidencing a continuity of purpose" confirm that the trial court's focus was on Trummel's behavior and not the message in his newsletters.
¶ 27 Further, contrary to Trummel's assertions, his behavior in forcing his newsletter onto the residents, as several residents alleged, is not constitutionally protected. Trummel cites Martin, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313, for authority that he has a constitutional right to provide tenants with hate-filled newsletters even if they do not want them. However, Martin does not support the right to impose speech  it supports the right to receive speech. To wit, "[f]reedom to distribute information to every citizen wherever he desires to receive it is so clearly vital to the preservation of a free society" Id. at 146-47, 63 S.Ct. 862 (holding that a blanket ordinance prohibiting all leafleting was unconstitutional).
¶ 28 More recently, the United States Supreme Court made it clear that in "[n]othing in the Constitution compels us to listen to or view any unwanted communication, whatever its merit." Rowan v. U.S. Post Office Dep't, 397 U.S. 728, 737, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970). The court "categorically" rejected the idea that a person has a right under the Constitution to send unwanted material into the home of another. Id. at 738, 90 S.Ct. 1484. Commentators note that it is out of respect for the "intense privacy values associated with the home in American law," that the home is the principal exception to the general rule that the burden is on the viewer to avert his or her eyes from unwanted speech. Rodney A. Smolla, Smolla and Nimmer on Freedom of Speech § 5.5 (3d ed.2003).[8]
¶ 29 As in Bering and Noah, we conclude that the trial court properly focused on the speaker's conduct and not the message, consistent with the constitution, to properly issue an antiharassment order. We find substantial evidence in the record documenting Trummel's conduct, which includes yelling and screaming at staff and residents, threatening residents, spying on residents, and disrupting meetings.
¶ 30 However, while we conclude that the antiharassment order was properly based on conduct and not on constitutionally protected activity and that the trial court acted within its discretion in fashioning the order to encompass nonparty residents in the context of their residency, we also believe that the restriction prohibiting Trummel from contacting Council House residents in any way and at any location (and board members, staff, and employees other than Mitchell) is in excess of the trial court's authority. Although a trial court has broad authority in this area, the authority is not limitless. RCW 10.14.070(6) provides in part that a court in a civil antiharassment protection proceeding shall have "broad discretion to grant such relief as the court deems proper, including an order: (a) Restraining the respondent from making any attempts to contact the petitioner; (b) Restraining the respondent from making any attempts to keep the petitioner under surveillance; (c) Requiring the respondent to stay a stated distance from the petitioner's residence and workplace."
*314 ¶ 31 This relief, though, must be warranted by the facts. As we recently held in Hough, "the facts of the relationship" between the parties should guide the court's discretion. Hough, 150 Wash.2d at 236, 76 P.3d 216. In this case, Mitchell is an administrator of a residential building and brought this action to prevent continued personal harassment of himself and as landlord to the tenants of Council House. While it was proper for the trial court to consider evidence of harassment from the tenants, it was not proper to grant relief to the tenants beyond the nexus of the landlord/tenant relationship and the harm. The harassing conduct affecting the tenants resulted from Trummel's actions as a fellow tenant. None of the nonparty tenants or staff alleged that Trummel engaged in harassing conduct outside of the Council House context.
¶ 32 The courts in both Noah and Bering clearly fashioned relief that was mindful of the relationship among the parties and the facts. In Noah, the court restrained the respondent from contacting the petitioner, placing the petitioner or his workplace under surveillance, and going within 300 feet of the petitioner's workplace and home. Noah, 103 Wash.App. at 35, 9 P.3d 858. Similarly, in Bering, the court prohibited picketers from (1) picketing, demonstrating, or counseling at the building (except for at a designated sidewalk); (2) threatening, assaulting, intimidating or coercing anyone entering or leaving the building; (3) interfering with ingress or engress at the building or parking lots; (4) trespassing on the premises; (5) engaging in unlawful activity directed at respondent-physicians or their patients; (6) using certain offensive words while children were present. Bering, 106 Wash.2d 212, 721 P.2d 918. Neither court included provisions restraining respondents from contacting the patients who were not parties to the action outside the context of the medical building.
¶ 33 In this case, even if the tenants were parties, as a matter of law the facts do not justify a broader antiharassment order. Thus, we find that the sixth restriction, prohibiting Trummel from contacting Council House residents (and board members, staff, and employees other than Mitchell) in any way at any location, provides relief to nonparties that is not justified by the facts in this case and was an abuse of the trial court's discretion.
¶ 34 Similarly, we hold that the trial court abused its discretion in modifying the original antiharassment order on October 26, 2001, and on June 21, 2002, by expanding the relief provisions regarding nonparties. For example, on October 26, 2001, the trial court added language to the sixth restriction, restraining Trummel from "attempting to keep under surveillance" any "current or former" resident of Council House and any Board member, staff, or employee of Council House at any location. The original antiharassment order only prohibited Trummel from "contacting" these nonparties and did not include the terms "current or former." On June 21, 2002, the trial court again modified the antiharassment order in part by adding language restraining Trummel from "[i]ntentionally or knowingly going within 100 feet of any past, current or future Council House Board member, resident, or employee," creating a 100 foot no contact zone around nonparties. CP at 565.
¶ 35 Under RCW 10.14.080, the court may, with notice to all parties and after a hearing, "modify the terms of an existing order." However, as was the case with the original antiharassment order, the relief must be justified by the facts. Hough, 150 Wash.2d at 236, 76 P.3d 216. Accordingly, the trial court also abused its discretion in further expanding Trummel's restraints involving nonparties that were outside the context of Council House.
¶ 36 Trummel next contends that the trial court abused its discretion in failing to grant a continuance of the April 19, 2001, hearing. Trummel claims that he was entitled to a continuance under the factors set forth in Balandzich v. Demeroto, 10 Wash. App. 718, 720, 519 P.2d 994 (1974). Whether a motion for continuance should be granted or denied is a matter of discretion with the trial court, reviewable on appeal for manifest abuse of discretion. Id. In exercising its discretion, a court may properly consider the necessity of reasonably prompt disposition of the litigation; the needs of the moving party; *315 the possible prejudice to the adverse party; the prior history of the litigation, including prior continuances granted the moving party; any conditions imposed in the continuances previously granted; and any other matters that have a material bearing upon the exercise of the discretion vested in the court. Id. A court abuses its discretion when its decision is based "`upon a ground, or to an extent, clearly untenable or manifestly unreasonable.'" Id. at 721, 519 P.2d 994 (quoting Friedlander v. Friedlander, 80 Wash.2d 293, 298, 494 P.2d 208 (1972)).
¶ 37 We agree with the Court of Appeals that the trial court did not abuse its discretion in failing to grant a continuance. RCW 10.14.070 requires that a court hold a hearing not later than 14 days from the date of the order. Trummel brought an initial petition for antiharassment against Mitchell on March 6, 2001. At that hearing on March 20, 2001, Trummel represented himself pro se and the judge granted a one month continuance for Trummel to prepare for Mitchell's cross-petition for an antiharassment order that was based on the same underlying facts as Trummel's petition. At the hearing on April 19, 2001, Trummel moved for another continuance which the trial court denied. CP at 139. Based on the totality of the facts, we conclude that the trial court did not abuse its discretion.[9]
¶ 38 Turning next to the contempt proceedings, the trial court found that Trummel had violated the provision in the order prohibiting surveillance. Trummel contends that the trial court erred in finding him in contempt because, he claims, the trial court defined "surveillance" too broadly, and the evidence was insufficient to support a finding of contempt. Whether contempt is warranted in a particular case is a matter within the sound discretion of the trial court; unless that discretion is abused, it should not be disturbed on appeal. Moreman v. Butcher, 126 Wash.2d 36, 40, 891 P.2d 725 (1995) (citing In re Pers. Restraint of King, 110 Wash.2d 793, 798, 756 P.2d 1303 (1988)). A finding of contempt will be upheld if the appellate court can find any proper basis for the finding. 15 Karl B. Tegland, Washington Practice: Civil Procedure § 43.22 (2003).
¶ 39 In this case, Trummel is correct. "Surveillance" is defined as to keep a "`close watch . . . over one or more persons.'" Noah, 103 Wash.App. at 44, 9 P.3d 858 (quoting Webster's Third New International Dictionary 2302 (1993)). During the hearing, the trial court admitted that it was using a broad definition of surveillance. In explaining himself, Judge Doerty said:
[T]here is no doubt [Trummel] has friends and acquaintances [at Council House and] there is no reason to suppose they might not have similar opinions about some of the issues at Council House that Mr. Trummel has and wouldn't be providing him with information, and that alone certainly would not be "surveillance" or "keeping watch." I will accept his position that the article, particularly the two we have been talking about  rather the one that was written prior "Ethnic Eviction Shenanigans"  was entered prior to the entry of the restraining order. To my way of thinking it does not matter when it was written, what matters is that knowing perfectly well what kind of order I had entered and having heard me talk about the order and what was expected, he then took that information and posted it on the web site. That is the problem, and that is what makes it *316 surveillance, not surveillance in the sense that it's been established necessarily that he goes out actively or pro-actively and recruits the information in order to publish it, but it certainly is surveillance in the sense of the intent and spirit of this statute.

RP (Oct. 1, 2001) at 21-22 (emphasis added).
¶ 40 In Noah, the court discussed activities that are included within the definition of "surveillance." The court first described three clear restraints in the antiharassment order relating specifically to surveillance: (a) making any attempt to keep the petitioner or his workplace or home under surveillance; (b) photographing or videotaping persons entering or leaving petitioner's building; and (c) aiding or abetting in any way any person or persons, or acting in concert in any way with any person or persons or acting by proxy (to include Francine Casebeer or June Noah) in doing any of the things which are prohibited to Respondent himself in this court order. Noah, 103 Wash.App. at 40, 9 P.3d 858. In discussing these provisions, the court noted that "[p]hotographs and videotapes constitute records of visual surveillance." Id. at 42, 9 P.3d 858.
¶ 41 In that case, the court found that the following conduct committed by respondent violated the above provisions: taking photographs of the petitioner entering and leaving the medical building and having others take pictures of the petitioner, taking the film from the third parties and developing the film, and then delivering the film back to the third parties for display within the zone. Id. at 44-45, 9 P.3d 858. This conduct clearly is consistent with the definition of "to keep a close watch over." Similarly, the court in Burchell concluded that the conduct there met definition of surveillance. Burchell, 74 Wash.App. 517, 874 P.2d 196. In that case, four people planned in advance to meet a religious figure at the airport. They brought "surveillance equipment," including walkie-talkies. Id. at 518, 874 P.2d 196. Upon arriving at the airport, two people stayed in their cars and two entered the terminal. The two entered the terminal, met the religious figure, entered into a verbal scuffle, and then continued to pursue him through the airport. Id. at 518-19, 874 P.2d 196. After the visitor escaped using airport security, the two in the airport used their walkie-talkies to alter the drivers to follow the visitor by car. Id. at 519, 874 P.2d 196. The group also continued to shadow the visitor until he flew away at the end of the weekend. Id. at 519-20, 874 P.2d 196. The court concluded, "[c]ertainly there was scienter as evidenced by the advance plan to provide surveillance. There was a course of conduct which began at the airport, stretched 35 miles into the next state, and then back again to the airport." Id. at 522, 874 P.2d 196.
¶ 42 Both Noah and Burchell provide traditional surveillance examples. In contrast, we can find no case to support the trial court's definition of surveillance as "violating the spirit of an antiharassment order" by making a respondent feel unsafe. Clearly, the trial court hoped that providing a no contact zone (a traditional protective order) would result in Trummel's losing interest in the goings on at Council House. However, nothing in the protective order prohibited Trummel from speaking about the residents, nonparties to the litigation.
¶ 43 In this case none of the traditional indicia of surveillance, as described in Noah and Burchell, were evidenced. Instead, the trial court relied on articles in which Trummel related information about a few meetings and miscellaneous incidents that took place at Council House during the four months after the antiharassment order was issued to conclude that Trummel had violated the surveillance prohibition. Accordingly, we hold that the trial court abused its discretion by concluding that posting a story on the Internet, based on an incident that was relayed by friends, violated the "surveillance" provision of the antiharassment orders.
¶ 44 As the ACLU notes, an order saying "do not place petitioner under surveillance" does not mean "do not say anything about petitioner." If the original order is interpreted in this manner, the ACLU claims it would be unconstitutional.[10] Accordingly, we *317 hold that the trial court abused its discretion in finding Trummel in contempt on October 1, 2001, and October 5, 2001, and vacate the orders of contempt. As a result, we also vacate the trial court's award of attorney fees for Mitchell and Council House for these contempt proceedings.
¶ 45 Next, Trummel challenges modifications made to the original antiharassment order. Based on the trial court's finding that Trummel had violated the restraint against surveillance in the original order, the court modified the order, stating that "based on his [Trummel's] behavior and actions to date, the Court determined that additional restraints were necessary to enforce this Court's prior [antiharassment] Order." CP at 587. Specifically, the trial court added a new provision, restraining Trummel from
[p]osting to the Internet or his web site, directly or indirectly, any personal identifying information including, but not limited to the name, address, phone number, social security number, or photograph, of any current, former or future staff member, resident, Board member, or agent, including attorneys, of Council House. This restraint may be waived by any of the individuals described in the preceding sentence only by providing Paul Trummel with a written waiver which Paul Trummel shall file with this Court prior to posting such information.
Id. at 588, 874 P.2d 196.
¶ 46 As noted above, we hold that the trial court erred in its finding of a violation of the original antiharassment order. We also hold that the trial court abused its discretion under RCW 10.14.080 in making this modification to enforce the prior order. The term "surveillance" is not broad enough to encompass the conduct of placing identifying information on a web site under the circumstances presented here. Moreover, as noted earlier, the modification provides relief to nonparties that is outside of the Council House context and is, therefore, beyond the authority of the trial court. Accordingly, we vacate this provision of the order.
¶ 47 Because we decide these issues on nonconstitutional grounds, we do not reach Trummel's constitutional claims regarding the trial court's findings of contempt and modifications to the antiharassment order. See, e.g., State v. Smith, 104 Wash.2d 497, 505, 707 P.2d 1306 (1985) (a court will not reach a constitutional issue if it can decide the case on nonconstitutional grounds); Isla Verde Int'l Holdings v. City of Camas, 146 Wash.2d 740, 752-53, 49 P.3d 867 (2002) (same).

ATTORNEY FEES
¶ 48 Trummel asks us to vacate the prior award of attorney fees to Mitchell on the contempt hearings. Because we hold that the trial court abused its discretion in finding Trummel in contempt in October 2001, we vacate the award of attorney fees granted by the trial court to Mitchell and Council House. Trummel also requests attorney fees under RCW 4.24.510 (the "anti-SLAPP statute") (strategic lawsuits against public participation)[11] and, alternatively, under Ino Ino v. *318 City of Bellevue, 132 Wash.2d 103, 143, 937 P.2d 154 (1997). He claims that he is entitled to attorney fees and costs under RCW 4.24.510 because Mitchell brought this action for the purpose of preventing him from making further complaints about Mitchell to government agencies.
¶ 49 We find no basis for an award of attorney fees under either theory. Trummel has not established that Mitchell brought the antiharassment petition based on Trummel's complaints to government agencies as required by RCW 4.24.510. The evidence relied upon by the trial court clearly establishes that Mitchell's petition is based on the harassing conduct exhibited by Trummel to Mitchell and Council House staff and residents, not based on complaints to government agencies. Under Ino Ino, 132 Wash.2d at 143, 937 P.2d 154, a court has discretion to award attorney fees when a person prevails in dissolving a wrongfully issued temporary injunction. In this case, unlike in Ino Ino, most of the original antiharassment order continues, and it is not a temporary order. Accordingly, we deny Trummel's request for attorney fees and costs.
WE CONCUR: ALEXANDER, C.J., and C. JOHNSON, SANDERS, BRIDGE, CHAMBERS, OWENS, FAIRHURST, and J.M. JOHNSON, JJ.
NOTES
[1] Judge Doerty also relied on the testimony, affidavits, and other material submitted in the prior hearing on March 20, 2001, initiated by Trummel. Trummel did not provide this court with the transcript from the prior hearing so it is not in the record.
[2] The trial court explained:

Upon entry of this order, you don't live at Council House any more. That is, of course, a severe response to an antiharassment petition because the minute I sign it, Mr. Trummel has got to find another place to live.... But given his approach to these proceedings, his contentious behavior of the earlier court order, his written responses, his unrelenting opinion that his career as a journalist entitles him to do anything he wants to the detriment of other people, I don't see any other way to write the order.
. . .
I don't believe that if I wrote an order that directed Mr. Trummel to stay off of other floors of the building or to leave people alone, which is what most of the people there would like, certainly everyone of the 48 Declarants would like to be left alone; or directed to him not to interfere with the management of the building, that he would do it. He would wiggle and weasel and manipulate and we would be right back in here in court or in another court. It simply isn't possible given the way Mr. Trummel has behaved, given what he has written and given his attitude expressed in his letter to me and his phone calls to the court staff that I could expect him to compromise, to be civilized or to in good-faith abide by any order that was less restrictive than the one I have written.
RP (Apr. 19, 2001) at 18, 22. As a result of the order Trummel vacated Council House.
[3] This motion was brought on September 19, 2001, close to one week after the September 11 attacks on the World Trade Center.
[4] The judge also vacated a prior finding of indigency (from July 20, 2001) pending further determination of Trummel's financial circumstances, including donations he received to his legal "defense fund." CP at 326. Trummel later provided documentation indicating that as of September 30, 2001, he had received $10,248.14 personally and that he has no idea how much money was contributed into a Legal Trust Fund that applies only to attorney fees and to which he claims he has no access.
[5] The court continued, "Beyond this the court will not intrude on Mr. Trummel's editorial rights except to require that all information posted by him on his web site be in good faith compliance with the anti-harassment order." Id. at 326.
[6] Although Mitchell originally filed his cross-petition contending that he was representing, among others, the residents of Council House, he has since conceded that the residents are not parties to this action.
[7] Below, Trummel relied heavily on Hough v. Stockbridge, 113 Wash.App. 532, 54 P.3d 192 (2002), for the proposition that a trial court had no power to issue relief to nonparties in a harassment proceeding. However, this court recently reversed the decision, holding that because courts have equitable powers under the Washington Constitution and the antiharassment statute specifically grants courts broad discretion to fashion relief, a court may issue mutual protective orders even in the absence of a petition for relief. Hough v. Stockbridge, 150 Wash.2d 234, 76 P.3d 216 (2003). A claim under chapter 10.14 RCW is a claim in equity. Id. at 236, 76 P.3d 216.
[8] Trummel cites certain federal and city rules asserting that they protect his right to distribute his newsletter to the residents. Federal regulation, 24 C.F.R. § 245.115, provides that owners of a multifamily housing project must allow tenants and tenant organizers to conduct certain activities related to the establishment or operation of a tenant organization. These activities include distributing leaflets in lobby areas, placing leaflets at or under tenants' doors and distributing leaflets in common areas. 24 C.F.R. § 245.115(a)(1)-(3). Similarly, Seattle Municipal Code 22.206.180(7) provides that it is unlawful for any owner to prohibit a tenant from engaging in the certain activities related to building affairs or tenant organizations. These activities include distributing leaflets in a lobby and other common areas and at or under tenants' doors and posting information on bulletin boards. SMC 22.206.180(7)(a)-(b). While these provisions do allow tenants to distribute literature relating to tenant organizations and building operation, Trummel has cited no authority for the proposition that he can distribute such literature (assuming his newsletters are covered by these rules) against the wishes of recipients. Indeed, federal law is to the contrary. See, e.g., 24 C.F.R. § 245.130 (a tenant has the right not to be recanvassed against his or her wishes regarding participating in a tenant organization).
[9] Trummel also claimed that the April 19, 2001, hearing violated his due process rights because he had to defend himself pro se. He claims that if a continuance had been granted, his attorney would have had more time to prepare and be present resulting in possible cross-examination of the declarants and proper objection to some of the evidence that may have been hearsay. We reject this claim. As the Court of Appeals noted, Trummel has not shown that either the statutory requirement for a full hearing under RCW 10.14.070 or the opportunity to have a hearing promised by Goldberg v. Kelly, 397 U.S. 254, 269, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), requires witnesses to testify when neither party has shown an inclination to present such testimony. Trummel v. Mitchell, 121 Wash.App. 1078 (2004). In this case, both parties were asked if they wanted to present testimony, each declined and said they would rely on their submitted materials. Additionally, although RCW 10.14.090 does not preclude either party from representation by private counsel, Trummel has cited no legal authority that entitles Trummel to representation at this type of civil proceeding.
[10] The ACLU also noted that "To be sure, a defendant's speech could be evidence of surveillance, as on a web site that reads, `Here is what I saw while following the petitioner home from work.' But this is not what happened below." ACLU Amicus Br. at 17. Additionally, the ACLU explained that:

One could imagine facts (not present in this record) where a harasser uses communications to third parties to visit unwanted contact upon a victim. For example, a harasser could impersonate the victim through a web page inviting people to a nonexistent party at the victim's house. In theory, such contact could be viewed as the harasser invading the privacy of the victim through unwanted contact, albeit to third parties.
Id. at 9.
[11] RCW 4.24.510 provides in relevant part: "Communication to government agency or self-regulatory organization  Immunity from civil liability."

A person who communicates a complaint or information to any branch or agency of federal, state, or local government ... is immune from civil liability for claims based upon the communication to the agency or organization regarding any matter reasonably of concern to that agency or organization. A person prevailing upon the defense provided for in this section is entitled to recover expenses and reasonable attorneys' fees incurred in establishing the defense and in addition shall receive statutory damages of ten thousand dollars. Statutory damages may be denied if the court finds that the complaint or information was communicated in bad faith.
RCW 4.24.500 explains the purpose behind RCW 4.24.510: "Good faith communication to government agency  Legislative findings  Purpose."
Information provided by citizens concerning potential wrongdoing is vital to effective law enforcement and the efficient operation of government. The legislature finds that the threat of a civil action for damages can act as a deterrent to citizens who wish to report information to federal, state, or local agencies. The costs of defending against such suits can be severely burdensome. The purpose of RCW 4.24.500 through 4.24.520 is to protect individuals who make good-faith reports to appropriate governmental bodies.