
# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| SHARON MAUREEN FOSSUM, | ) | No. 71045-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| DAVID WAYNE HECKMAN, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: April 27, 2015 |

SPEARMAN, C.J. — David Heckman challenges the anti-harassment order against him on three grounds. First, he contends that the commissioner's entry of a permanent anti-harassment order on Sharon Fossum's motion for reconsideration was error, arguing that the motion was procedurally barred and that the commissioner failed to make the requisite findings and fact. Next, he contends that there is insufficient evidence in the record to support the trial court's entry of an anti-harassment order on revision. Finally, he contends that the trial court's entry of a permanent order was not justified by the facts of the case. We disagree with each contention and affirm.

## FACTS

Respondent Sharon Fossum and appellant David Heckman have known each other for over twenty years. They are part of the same religious

congregation. And, although they were close during Sharon's[1] teen years, because of her age and religious upbringing, they never saw each other outside the supervision of Sharon's parents and their relationship was never romantic or physical. The two have maintained contact over the years and, until 2011, Sharon considered Heckman a close family friend.

In March 2009, Sharon and her husband of nearly twenty years, Ron, hired Heckman to work in their financial services business. The parties' friendship became strained when a female employee accused Heckman of sexually harassing her. After an investigation, it was determined that Heckman, who was married, had harassed this employee, who was also married, by sending her inappropriate texts and emails. After the employee complained, Heckman made an anonymous threatening telephone call to her husband. As a result, the Fossums fired Heckman.

When Heckman's employment was terminated in February 2011, Ron told Heckman that he would seek a restraining order if Heckman contacted any clients, employees, or partners of the business. Despite this warning, Heckman began sending text messages and emails to Sharon. Ron approached Heckman again and told him to stop contacting Sharon. Sharon also followed up with Heckman herself. She sent an email to Heckman in August 2011 explaining her discomfort at the number of emails and text messages he sent and the reason she stopped responding. It stated:

---

[1] The Fossums are referred to by their first names for clarity.

2

>As you have noticed, I have stopped responding to your emails and texts [sic] messages. I started to feel uncomfortable with the volume/amount of texts and emails that were going between us. I have many other male friends in the congregation, and they text or email me rarely if at all. As a married sister in the congregation, I do not feel it is appropriate to be sending messages to a married brother who is not my husband.

Clerk Papers (CP) at 160.

Heckman initially agreed to stop contacting Sharon and to remove all of the Fossums' contact information from his phone. However, about two years later, he contacted Sharon again. On May 5, 2013, Heckman called Sharon to tell her that he was leaving some items belonging to her husband's parents on her front porch. Sharon thought it was odd for Heckman to contact her after he was told not to, particularly because Heckman knew other family members whom he could have called to drop off the items. In fact, several of those relatives lived closer to Heckman and he had to drive by their homes to get to the Fossums' home.

Over the following weeks, Sharon's brother, who also worked with the Fossums, noticed Heckman driving by the business once or twice a week. Sharon's brother found this unusual, because the business was not on a route where a person would regularly commute.

On June 9, 2013, Sharon attended a religious service at her place of worship, where Heckman also attended. As she was leaving the restroom, she noticed Heckman standing in a corner with a large handwritten sign that said "Call Me." CP at 184, 203. Sharon ignored this message and did not call Heckman.

The following day, June 10, 2013, an unknown woman called the Fossums' business and asked to speak to Ron. When the receptionist told her that Ron was unavailable, the caller, who identified herself as "Lola," insisted upon knowing whether Ron was in the office. CP at 176-77. According to the receptionist, the caller was "pumping" her for information. CP at 177. The receptionist knew that Ron was out of the country on a business trip, but declined to give that information to the caller since she was not known to the receptionist. Eventually, the caller hung up without leaving a callback number.

Several minutes later, Sharon received a text message on her cell phone, which stated, "'Sharon, do you want a call from your secret admirer? I can take u places u have never been and where u need to go badly. Please say yes.'" CP at 184. The message was from the same phone number as that of the person who had just called the office trying to locate. Sharon did not respond to the text message.

Sharon received a telephone call from the same phone number the following day. She declined to answer and, a short time later, she received another text message: "'IF U ARE SLIGHTLY INTERESTED WEAR BLACK STOCKINGS NEXT TIME U GET DRESSED UP.'" CP at 203.

After this series of calls and text messages, Sharon became afraid she was being watched. Because of the phone call to the office asking for her husband, she also believed that whoever was sending the messages also knew that Ron was travelling and she was alone. In her concern, she asked friends to

stay with her for a few days until her husband returned home. She also contacted the police.

The police officer who met with Sharon described her as "visibly shaken" and "very upset." CP at 201. The officer determined that the phone from which the phone calls and texts were made was an "untraceable pre-paid phone" or "burn phone." Id. When asked, Sharon told the officer that she "had a feeling" the text messages came from Heckman. Id. When the officer called the phone number from which the text messages and calls were made, a woman answered. The woman admitted to the officer that her friend "Dave" had paid her to use the phone. Id.

At the recommendation of the police officer who had taken her report, Sharon sought an anti-harassment order against Heckman. CP at 182-85, 201. Her petition set forth each of Heckman's unwanted contacts and advances (CP at 184) and expressed the Fossums' concerns that Heckman was repeating the same pattern of escalating behavior that had led to the allegations of sexual harassment against him in 2011.

Heckman did not deny Sharon's allegations. Instead, he responded to the petition with attempts to show that Sharon desired and encouraged his advances.

Initially, the commissioner presiding over the anti-harassment order proceedings denied Sharon's petition on the grounds that she had not made clear to Heckman that she wanted no contact from him. Sharon filed a motion for reconsideration of this ruling, in which she requested that the commissioner

5

consider the certified transcript of interviews of Heckman conducted as part of the 2011 sexual harassment investigation. The transcripts confirmed that Heckman was directly instructed to have no contact with clients, employees, and partners of the Fossums' business, including Sharon. According to Sharon's affidavit, she had not had time to obtain certified copies of the transcripts before the initial hearing. "Due to an objection from opposing counsel regarding authenticity of the materials, those transcripts were not submitted to the Court." CP at 138. Over Heckman's objection, the commissioner considered the transcripts in ruling on the motion for reconsideration. After oral argument, the commissioner granted the motion to reconsider and entered a permanent no contact order against Heckman. Heckman moved for reconsideration of the commissioner's order, without success.

Heckman then moved for revision by a superior court judge. After an independent review of the evidence, the trial court found, "[b]ased upon the petition, testimony, and case record[,]... that the respondent committed unlawful harassment as defined in RCW 10.14.080, and was not acting pursuant to any statutory authority. . . ." CP at 59. The trial court also found that Heckman was "likely to resume unlawful harassment of the petitioner when the order expires." CP at 59. The court denied Heckman's motion for revision and entered a permanent anti-harassment order against Heckman.

Heckman appeals.

## DISCUSSION

### I.

Heckman first asks this court to vacate the anti-harassment order entered by the commissioner on Sharon's motion for reconsideration, arguing that the motion was procedurally barred and that the commissioner failed to make the requisite findings and fact. But, "[o]nce the superior court makes a decision on revision, the appeal is from the superior court's decision, not the commissioner's." State v. Ramer, 151 Wn.2d 106, 113, 86 P.3d 132 (2004) (citing State v. Hoffman, 115 Wn. App. 91, 101, 60 P.3d 1261 (2003)). Here, Heckman failed to raise these issues on revision and the trial court had no occasion to address them. Accordingly, the issues are not properly before us and we decline to address them.

### II.

Next, Heckman argues there is insufficient evidence to support the issuance of the anti-harassment order against him. We disagree.

Ch. 10.14 RCW gives trial courts involved in civil anti-harassment proceedings "'broad discretion to grant such relief as the court deems proper, including an order: (a) Restraining the respondent from making any attempts to contact the petitioner; (b) Restraining the respondent from making any attempts to keep the petitioner under surveillance; (c) Requiring the respondent to stay a stated distance from the petitioner's residence and workplace.'" Trummel v. Mitchell, 156 Wn.2d 653, 668, 131 P.3d 305 (2006) (quoting RCW 10.14.070(6)). Relief may be granted if the trial court find that the party subject to an anti-

harassment order has committed "unlawful harassment," which the statute defines as a "course of conduct directed at a specific person which seriously alarms, annoys, harasses, or is detrimental to such person, and which serves no legitimate or lawful purpose." RCW 10.14.020(2), .080(3). "Course of conduct" is defined as a "pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose." RCW 10.14.020(1). In determining whether the course of conduct serves a legitimate or lawful purpose, courts should consider whether:

> (1) Any current contact between the parties was initiated by the respondent only or was initiated by both parties;
> (2) The respondent has been given clear notice that all further contact with the petitioner is unwanted;
> (3) The respondent's course of conduct appears designed to alarm, annoy, or harass the petitioner;
> (4) The respondent is acting pursuant to any statutory authority . . . .

RCW 10.14.030. Where the trial court's findings of fact provide a proper basis for entry of an anti-harassment order and substantial evidence supports the findings, the order will be upheld on appeal. State v. Noah, 103 Wn. App. 29, 39, 9 P.3d 858 (2000).

In this case, the trial court's anti-harassment order included a preprinted finding that "respondent committed unlawful harassment, as defined in RCW 10.14.080, and was not acting pursuant to any statutory authority." CP at 59. To the extent that Heckman argues this finding was insufficient because it was part of a preprinted form, his argument lacks merit. See, Spence v. Kaminski, 103 Wn. App. 325, 332, 12 P.3d 1030 (2000) (rejecting an appellant's claim that "preprinted findings on a form are insufficient to indicate the factual basis for the

8

court's conclusions" for a permanent protection order under ch. 26.50 RCW, which, like the RCW 10.14.080 order in this case, did not result in a "massive curtailment of [appellant]'s liberty.") Moreover, the trial court's finding is amply supported by the evidence before it, which established:

• After Sharon had previously told Heckman via email that she no longer wanted contact with him, Heckman appeared at Sharon's place of worship nearly two years later holding a large "call me" sign. CP at 160, 172, 184.

• After Sharon did not call Heckman as requested, he directed a friend to anonymously call her office to find out whether her husband was out of town.

• After confirming that Sharon was alone, Heckman texted a sexually suggestive message to her, asking her to say "yes" to his advances.

• After Sharon declined to answer that text message, Heckman called her directly.

• After Sharon declined to answer the phone call from Heckman, he texted her another sexually suggestive message, stating that he would watch her for a sign that she was receptive to his advances.

• These text messages, which Heckman sent anonymously, made Sharon "fearful" and caused her to worry that Heckman was "obsessed with her;" accordingly, she sought protection from friends and the police. CP at 188, 191.

Collectively, this evidence of Heckman's repeated advances established that he engaged in a course of conduct against Sharon that seriously alarmed, annoyed, and harassed her, without lawful authority.

Although Heckman offered countervailing evidence, namely his statements in his declaration that his advances were desired and encouraged by Sharon, the trial court, as factfinder, was entitled to find that these assertions

9

were unconvincing. And we defer to the trial court's determinations on the persuasiveness of the evidence, witness credibility, and conflicting testimony. State v. Ainslie, 103 Wn. App. 1, 6, 11 P.3d 318 (2000).

Because there is substantial evidence that Heckman committed unlawful harassment, the trial court's challenged finding is binding on appeal. And, based on this finding, the trial court properly imposed the anti-harassment order against Heckman.

III.

Lastly, Heckman argues that the trial court had no basis to impose a permanent order in this case. Again, we disagree.

Antiharassment orders issued pursuant to RCW 10.14.080 presumptively expire after a year. Imposition of an order effective for more than one year or a permanent order requires a finding that "the respondent is likely to resume unlawful harassment of the petitioner when the order expires." RCW 10.14.080(4).

Heckman contends that the trial court "failed to issue any findings or conclusions to support its issuance of a permanent order as opposed to a one year or longer fixed duration order." Brief of Appellant at 14. He asserts. Furthermore, that "[t]here exists no evidence in the record to support this permanent order." Id. However, the trial court's anti-harassment order plainly stipulates: "If the duration of this order exceeds one year, the court finds that respondent is likely to resume unlawful harassment of the petitioner when the order expires." CP at 59. Thus, the court made the requisite finding to justify a

permanent order in this case. And as noted above, there is substantial evidence in the record, to support this finding.

Affirm.

WE CONCUR:

Spearman, C.J.,

Dwyer, J.

Appelwick, J.