# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 71414-7-I |
| | ) | |
| JENNIFER LYNN ROOT, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SALVADOR AGUILAR HURTADO, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: December 22, 2014 |
| | ) | |

VERELLEN, A.C.J. — Salvador Hurtado appeals from the decree of dissolution, parenting plan, and related orders. He contends that the trial court erred by denying his motion for a continuance so he could retain counsel for trial. But because he requested the continuance on the day of trial when he had 11 months' notice of the trial date and provided no justification for his delay in seeking counsel, the trial court's denial of the continuance was a proper exercise of discretion. Hurtado's other challenges to the parenting plan and other orders relating to the dissolution proceeding do not support any relief on appeal. Accordingly, we affirm.

## FACTS

Jennifer Root, an American citizen, and Salvador Aguilar Hurtado, a Mexican citizen, were married in Mexico on April 6, 2008. Their child, Nicole, was born in Mexico

on November 21, 2009. The family resided in Mexico until November 2011, when the couple separated.

In November 2011, Root moved back to Washington with Nicole. She moved in with her grandmother in Medina. Hurtado remained in Cabo San Lucas, Mexico. Root and Hurtado agreed to have Nicole travel between their respective homes every two to three months. From mid-November 2011 to mid-January 2012, Nicole stayed with Root; from mid-January 2012 to March 2012, she stayed with Hurtado; from April 2012 to early June 2012, she stayed with Root; from early June 2012 to mid-August 2012, she stayed with Hurtado; and from August 11, 2012 through January 2013, she stayed with Root.[1]

On January 4, 2013, Root filed a petition for dissolution in King County Superior Court and a motion for temporary orders. On January 7, 2013, Hurtado was personally served in Washington with the petition and motions for temporary orders, which included a proposed temporary parenting plan. On January 9, 2013, the order setting the case schedule was mailed to Hurtado.

On February 6, 2013, Root's attorney Kim Schnuelle received an e-mail from attorney Stacy Nossaman-Petitt indicating that Petitt was meeting Hurtado to "go over the paperwork and get it signed."[2] Petitt also requested that Schnuelle send her all the pleadings that were sent to Hurtado to be signed. On February 7, 2013, Schnuelle e-mailed Petitt the motion for temporary orders, including the proposed temporary parenting plan. On February 8, 2013, Petitt mailed to the King County Superior Court

---

[1] When in Mexico, Nicole spent the majority of her time with Hurtado's parents because his work schedule limited his time with her to a few hours a day.

[2] Clerk's Papers (CP) at 51.

2

clerk Hurtado's response to the petition for dissolution. The response was signed by Hurtado, "Pro-Se."[3]

On February 12, 2013, Petitt e-mailed Schnuelle the signed response, agreed temporary parenting plan, and agreed temporary orders. On February 14, 2013, the court entered the agreed temporary parenting plan signed by Hurtado. After the orders were entered, Hurtado began paying monthly child support as ordered.

On April 25, 2013, consistent with the agreed temporary parenting plan, Nicole flew to Mexico to spend residential time with Hurtado. According to the residential schedule in the temporary parenting plan, Nicole was to return to Seattle on June 30, 2013. In late May and early June of 2013, Root sought to confirm with Hurtado when Nicole would be returning. When Hurtado did not respond, Schnuelle sent him a letter requesting a confirmation of Nicole's return date and flight information.

Hurtado responded in an e-mail to Schnuelle, stating that he had already talked to Root and that he had hired an attorney in Mexico, Asdruval Drake. Hurtado directed Schnuelle to contact Drake directly and stated that after seeing the situation "more clearly," he was "not happy at all with this agreement."[4] Schnuelle and Drake then exchanged e-mails, and Schnuelle provided Drake with a copy of the temporary parenting plan. Schnuelle also asked Drake to confirm Nicole's return date, advising him that the temporary parenting plan designated the United States as Nicole's habitual residence and that if Hurtado failed to return her, he would be in violation of the Hague Convention on the Civil Aspects of International Abduction (Hague Convention).[5]

---

[3] CP at 336.
[4] CP at 128.
[5] Oct. 25, 1980, T.I.A.S. No. 11670.

3

Drake responded that he was waiting to hear from Hurtado and told Schnuelle that Hurtado felt he was coerced into signing the agreement.[6] Drake also stated that "the habitual residence of the child was arbitrarily designated Washington," contending that "we can prove that the child was abducted from Mexico by his mother, and misled [Hurtado,] telling him she was [going to] think and try to solve their marriage."[7] Drake further stated that Hurtado accepted the agreement not knowing that Root was pregnant with another man's child.

On June 25, 2013, Drake e-mailed Schnuelle about a message Hurtado received from Root asking what time he would be at her house with Nicole. Drake stated that according to Hurtado, he and Root had agreed that he would take Nicole back to Seattle a few weeks after Root had her new baby. Schnuelle responded that Root never agreed to a later return date and that the schedule in the parenting plan provided for Nicole's return at the end of June. Schnuelle then warned that if Hurtado failed to return Nicole by that time, he would be in violation of the parenting plan and Root would pursue her legal remedies.

On June 26, 2013, Root hired another attorney, Eddie Levy, to pursue a Hague Convention case in Mexico against Hurtado to return Nicole to her care. Levy filed the necessary pleadings in a Mexican court. Sometime in July 2013, Hurtado apparently filed a competing divorce action in the Mexican courts.[8]

---

[6] According to Hurtado, Nicole "had been arbitrarily detained and hid from him on his visit to Seattle when he went to pick his daughter up to come home as they previously talked," and that "afterwards he couldn't see her for months until he signed that document under threat of not seeing her anymore." CP at 141.

[7] CP at 142.

[8] The only evidence in the record of the Mexican divorce proceeding is attorney Levy's testimony to the Washington court that he learned from the Mexican court

On July 24, 2013, when Nicole had not yet been returned to Seattle, Root filed a motion for contempt and for enforcement of the temporary parenting plan in King County Superior Court. Root was unable to personally serve Hurtado with the contempt motion, but she mailed it to him in Mexico along with the motion to enforce the temporary parenting plan. The pleadings were also e-mailed to Hurtado and Drake. A show cause hearing was set for August 22, 2013.

On August 22, 2013, Hurtado failed to appear for the hearing, and the court entered an order granting Root's motion to enforce the temporary parenting plan. The court ordered that Nicole be returned by August 27, 2013, and suspended all visitation outside of the United States pending further order of the court. The order also noted that Root's contempt motion "remains to be served" and that relief related to that motion would be addressed at a review hearing on October 17, 2013.[9]

Schnuelle sent to Hurtado via Federal Express the order granting the motion to enforce the temporary parenting plan and all the pleadings, including notice of the October 17, 2013 review hearing. Federal Express twice attempted to deliver the documents, but Hurtado refused to accept delivery. Schnuelle also e-mailed the documents to Hurtado and Drake.

By the October 17 review hearing, Nicole still had not been returned to Root, and Hurtado failed to appear at the hearing. At the hearing, the court upheld the order granting the motion to enforce the parenting plan and entered judgment against Hurtado, including a $500 per day fine for each day he kept Nicole past the ordered

---

hearing the Hague Convention claim that Hurtado had filed a parallel divorce action in Mexico.

[9] CP at 160.

return date. Again, Schnuelle sent Hurtado and Drake the orders by both first class mail and e-mail.

In November 2013, Root retained attorney James Clark to represent her in the dissolution trial. Clark notified Hurtado and Drake that he would be representing Root. On December 10, 2013, Clark e-mailed Hurtado and Drake the witness and exhibit list, trial brief, and Root's financial declaration.

On December 13, 2013, Root's other attorney Levy obtained a provisional order from the Mexican court allowing Root to obtain immediate custody of Nicole. Nicole and Root returned to Seattle.

On December 18, 2013, attorney Clark's office sent Hurtado an e-mail stating that trial was set for 9:00 a.m. on December 19, 2013 at the Kent Regional Justice Center. Hurtado e-mailed back, stating that he was in Mexico and asking for a continuance so that he could retain a lawyer in Washington to prepare for trial. The next day, the day of trial, Hurtado did not appear before the court. Instead, attorney Roni Ordell appeared on his behalf for the limited purpose of requesting a continuance of the trial date. The trial court denied the continuance.

Trial proceeded without Hurtado or counsel for Hurtado. The court heard testimony from Root and attorney Levy. The court also obtained a translation of the December 13 order issued by the Mexican court in the Hague Convention proceeding.

After hearing the evidence, the trial court entered final orders on the dissolution, including a final parenting plan and an order of child support. The final parenting plan restricted Hurtado's residential time to supervised visitation in King County, Washington. The parenting plan identified the basis for this restriction as Hurtado's withholding

access to the child without good cause and Hurtado's violation of the temporary parenting plan. The parenting plan also designated the United States as the child's habitual residence "for all legal purposes, including purposes of the Hague Convention."[10] The court entered the final parenting plan by default due to Hurtado's failure to appear for the trial proceedings.

On January 8, 2014, Hurtado filed a notice of appeal seeking review of the dissolution decree, final parenting plan, and final order of child support.

On February 25, 2014, Hurtado filed a motion for an order to vacate the final dissolution orders in the trial court. He also challenged the temporary parenting plan entered on February 14, 2013 and the order granting Root's motion to enforce the temporary parenting plan. The court denied the motion.[11]

## DISCUSSION

### *Continuance*

Hurtado contends that the trial court erred by denying his request for a continuance to retain counsel. We disagree.

The trial court has discretion to grant or deny a motion for continuance, and we review such a ruling only for a manifest abuse of discretion.[12] In exercising this discretion, a court may properly consider

> the necessity of reasonably prompt disposition of the litigation; the needs of the moving party; the possible prejudice to the adverse party; the prior history of the litigation, including prior continuances granted the moving party; any conditions imposed in the continuances previously granted; and

---

[10] CP at 181.

[11] The parties agree that the court denied the motion, but the order has not been designated as part of the record, nor is it designated in the notice of appeal.

[12] Trummel v. Mitchell, 156 Wn.2d 653, 670, 131 P.3d 305 (2006).

any other matters that have a material bearing upon the exercise of the discretion vested in the court.[13]

Here, attorney Ordell appeared on the day of trial to ask for a continuance on Hurtado's behalf. Ordell indicated that he had spoken with Hurtado only the day before and that he was not prepared to go forward, adding that Hurtado had not yet even retained him. Ordell did not provide a justification for the delay, but the trial court noted Hurtado's limited participation in the proceedings:

> The father has not actively participated in much of anything, so location, where it's part of the problem[,] . . . my review of all of the records in this case would indicate that the problem is in your client, in fact, the cause of the lack of participation, so.[14]

The trial court denied the continuance, noting that the trial had been "scheduled for some time" and that there was "a very important witness [attorney Levy] who is here from Mexico City."[15]

The trial court properly exercised its discretion by denying the continuance. It was requested on the day of trial when Hurtado had more than 11 months' notice of the trial date and ample opportunity to secure counsel. In January 2013, Hurtado was served with the case schedule setting the trial date. In February 2013, he entered agreed temporary orders with the assistance of an American attorney. He then participated in the proceedings up until the end of June 2013, when he decided to not return Nicole to Washington. Hurtado then retained Mexican counsel Drake, who communicated with Root's attorney and who also received all the relevant pleadings and trial materials that had been sent directly to Hurtado.

---

[13] Id. at 670-71.

[14] Report of Proceedings (RP) (Dec. 19, 2013) at 8.

[15] Id. at 31.

In August and October 2013, there were additional court hearings where Hurtado could have made a request for a continuance to obtain counsel, but he failed to appear without explanation.[16] In December 2013, in preparation for trial, Root's attorney sent both Hurtado and Drake trial materials, including a witness list naming attorney Levy, who was traveling from out of state to appear for trial. But Hurtado made no attempt to communicate with Root or the court about the trial until after the Mexican court ordered that Nicole be returned to Root, which was just a few days before trial. The trial court's denial of his day-of-trial request for a continuance was within the trial court's discretion.

*Subject Matter Jurisdiction*

Hurtado next contends that the trial court erred by exercising subject matter jurisdiction over the parenting plan. We disagree.

Under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), chapter 26.27 RCW, a Washington court may exercise jurisdiction over a custody determination:

> (1) Except as otherwise provided in RCW 26.27.231 [temporary emergency jurisdiction], a court of this state has jurisdiction to make to an initial child custody determination only if:
>
> (a) This state was the home state of the child on the date of the commencement of the proceedings, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from the state but a parent or person acting as a parent continues to live in the state;
>
> (b) A court of another state does not have jurisdiction under (a) of this subsection, or a court of the home state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under RCW 26.27.261 or 26.27.271, and:

---

[16] Specifically, the show cause hearing on August 22, 2013, the review hearing on October 17, 2013, and the pretrial conference on October 23, 2013.

9

(i) The child and the child's parents, or the child and at least one parent or a person acting as a parent, *have a significant connection with this state other than mere physical presence; and*

(ii) *Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships;*

(c) All courts having jurisdiction under (a) of this subsection have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under RCW 26.27.261 or 26.27.271; or

(d) No court of any other state would have jurisdiction under the criteria specified in (a), (b), or (c) of this subsection.[17]

RCW 26.27.021(7) defines "home state" as

the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. . . . A period of temporary absence of a child, parent, or person acting as a parent is part of the period.

The UCCJEA treats a foreign country as if it were a state of the United States for purposes of applying this section.[18]

Because Nicole had not been in either Washington or Mexico for six consecutive months at the time Root filed the dissolution petition, there was no home state.[19] Accordingly, the court could acquire jurisdiction under RCW 26.27.201(1)(b) based on "significant connections" to Washington.[20] Root contends that Hurtado agreed to the

---

[17] RCW 26.27.201 (emphasis added).

[18] RCW 26.27.051; In re Marriage of Rostrom, No. 71860-6-I (Wash. App. December 1, 2014), slip op. at 5.

[19] See In re Marriage of Hamilton, 120 Wn. App. 147, 154, 84 P.3d 259 (2004) (where parents lived in separate states and child had not lived in either state for a full six months immediately before a petition for custody was filed, neither state was the home state).

[20] Id. at 154-55; see also In re custody of A.C., 137 Wn. App. 245, 254-55, 153 P.3d 203 (2007).

Washington court's exercise of jurisdiction on this basis as stated in his response to the dissolution petition. While Hurtado is correct that parties cannot agree to subject matter jurisdiction,[21] his response does contain an admission to facts supporting the exercise of jurisdiction under RCW 26.27.201(1)(b).

In his response to the petition for dissolution, Hurtado admits "paragraph 1.1 through 1.16 inclusive."[22] Paragraph 1.14 of the petition states:

> This court has jurisdiction over the child for the reasons set forth below.
>
> The child and the parents or the child and at least one parent or person acting as a parent have significant connection with the state other than mere physical presence; and substantial evidence is available in this state concerning child care, protection, training and personal relationships; and the child has no home state elsewhere.
>
> No other state has jurisdiction.[23]

Thus, while Hurtado's consent alone could not serve as a valid basis for the Washington's court's exercise of jurisdiction, the lack of any home state and his admission that there are significant connections with and substantial evidence in Washington concerning child care, protection, training, and personal relationships establishes a basis for jurisdiction under RCW 26.27.201(1)(b).

Additionally, as in State v. Hamilton, the record here supports Hurtado's admission.[24] In Hamilton, the court properly assumed jurisdiction under

---

[21] A.C., 137 Wn. App. at 253.

[22] CP at 336.

[23] CP at 3.

[24] 120 Wn. App. 147, 84 P.3d 259 (2004).

RCW 26.27.201(1)(b) where the mother had previously lived in Washington as a child and during college, and her child received medical treatment in Washington.[25]

Similarly here, the record establishes that Root and Nicole had significant connections to Washington, and substantial evidence exists in Washington concerning child care, protection, training, and personal relationships. Root was born and raised in Washington. Other than her move to Mexico during her brief marriage to Hurtado, Washington was her only place of residence. She moved in with her grandmother in Washington, with whom Nicole developed a strong bond, and she had other relatives in Washington. Root also had a stable job in Washington by which she fully supported herself financially.

At the time Hurtado signed the agreed temporary parenting plan, Nicole had lived 10 out of the previous 16 months in Washington, including the 6 consecutive months before he signed the temporary parenting plan. Nicole was also attending preschool, bonding with her great-grandmother and other extended family, and engaging in age-appropriate activities on a regular basis in Washington. Due to Root's predictable and reasonable work schedule, Nicole regularly had breakfast and dinner with Root, attended preschool, or was in the care of her great grandmother while Root was working, and had a reasonable and consistent bedtime. Additionally, Nicole was able to regularly spend quality time with Root after work hours, engaging in activities such as painting, reading books, playing games, and visiting with Root's horses. Root was also often able to take mid-day breaks on workdays to visit her. Other than being in the care

---

[25] Id. at 155.

of his parents while he worked, Hurtado points to no other evidence of Nicole's

significant connections to Mexico.[26]

*Designation of Habitual Residence*

Hurtado next challenges the provision in the final parenting plan that designates

the United States as Nicole's habitual residence "for all legal purposes, including

purposes of the Hague Convention."[27] He argues that the trial court improperly relied

on a similar provision in the temporary parenting plan instead of making an independent

determination of Nicole's habitual residence at the time it entered the final parenting

plan. Hurtado asserts that, as with subject matter jurisdiction, such a designation

cannot be agreed to and that the court had an "obligation" to make a factual

determination of which country should be designated as the habitual residence. He

contends that the failure of the court to do so renders the parenting plan void. We

disagree.

Hurtado asserts that parties cannot waive the trial court's determination of

habitual residence. But we need not reach the question of waiver. Hurtado provides no

authority that requires or allows the trial court to make an independent determination of

habitual residence at the time it enters a parenting plan. Rather, the determination of

---

[26] For the first time at oral argument, Hurtado referred to the simultaneous proceedings provisions of the UCCJEA. But because this was not included in the assignments of error, briefed or supported by citations to the record, it is not properly before us. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (issues raised and argued for the first time in a reply brief are too late to warrant consideration; claims not supported by reference to the record or citation to authority are not considered on appeal); McKee v. American Home Products Corp. 113 Wn.2d 701, 705, 782 P.2d 1045 (1989). ("We will not consider issues on appeal that are not raised by an assignment of error or are not supported by argument and citation of authority.").

[27] CP at 181.

habitual residence is at issue only when there is an allegation of abduction or retention of a child across international borders in violation of the Hague Convention.[28] Such allegations must be pursued in an action specifically brought under the Hague Convention, the narrow focus of which is to secure the rapid return of a child to his or her habitual residence, where custody decisions can then be addressed.[29]

Here, the Washington court was presiding over a dissolution action involving a parenting plan, not hearing a Hague Convention claim. Habitual residence was therefore not at issue or relevant to the proceedings. By contrast, the separate Hague Convention action in Mexico was for the sole purpose of securing the return of the child to Washington after she had been withheld from Root. Thus, the issue of habitual residence was a determination to be made in the Mexican court hearing that claim and was not properly before the Washington court.[30]

Hurtado fails to show that the trial court's inclusion of the habitual residence designation in the final parenting plan without making an independent determination of that designation invalidates the parenting plan. Neither party put habitual residence at

---

[28] Mozes v. Mozes, 239 F.3d 1067, 1070 (9th Cir. 2001); Hague Convention, Art. 3.

[29] Mozes, 239 F.3d at 1070; Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,505 (March 26, 1986) ("The Convention is premised upon the notion that the child should be promptly restored to his or her country of habitual residence so that a court there can examine the merits of the custody dispute and award custody in the child's best interests.").

[30] Root's attorney Levy testified that the determination by the Mexican court in the Hague Convention proceeding would take precedence over any custody issue in a separate parallel divorce filing. See Hague International Child Abduction Convention, 51 Fed. Reg. at 10,050 ("Under Article 17 that State cannot refuse to return a child solely on the basis of a court order awarding custody to the alleged wrongdoer made by one of its own courts or by the courts of another country. This provision is intended to ensure, inter alia, that the Convention takes precedence over decrees made in favor of abductors before the court had notice of the wrongful removal or retention.").

issue during the dissolution proceedings, nor was it relevant to those proceedings.[31]

Thus, at most, the habitual residence designation is surplusage; its inclusion does not

render the parenting plan void.

*Other Challenges to the Parenting Plan and Child Support Order*

Hurtado further contends that the final parenting plan is void because Root

failed to comply with RCW 26.09.181(1)(a), which provides that each party "shall file

and serve a proposed permanent parenting plan" on or before either 30 days after

service and filing of a notice for trial or 180 days after the action is commenced,

whichever comes first. Root did not file her proposed permanent parenting plan until

she moved for entry of it at trial. Hurtado contends that because he was not aware of

her proposal until after it was entered, he was prevented from contesting it. Therefore,

he argues the final parenting plan grants relief beyond that requested, the plan is "void

on its face and due process demands that it be vacated."[32] But Hurtado fails to

mention that the court entered the order without his input because he voluntarily failed

to appear for trial. As a result, Hurtado has waived any objections to the errors he now

claims on appeal.[33] Moreover, as Root points out, Hurtado did not file a proposed final

---

[31] The parenting plan does not reference the Hague Convention proceeding in Mexico as a basis for any of its provisions. The only basis identified for the restrictions on Hurtado's residential time was his withholding of the child in violation of the agreed temporary parenting plan. Section 2.2 of the parenting plan states that "[t]he Respondent's involvement or conduct may have an adverse effect on the child's best interest because . . . [a] parent has withheld from the other parent access to the child for a protracted period without good cause and in violation of the temporary parenting plan entered on February 14, 2013 and the court order dated August 2, 2013. The father abducted the child in Mexico and kept the child without the Mother's consent from June 30, 2013 until December 13, 2013." CP at 175.

[32] Appellant's Br. at 17.

[33] See RAP 2.5(a); State v. Williams, 159 Wn. App. 298, 312-13, 244 P.3d 1018 (2011).

15

parenting plan himself and cites no legal authority for vacating the final parenting plan on the basis that she failed to file one. Rather, the only remedy provided in the statute for failure to file a proposed parenting plan is for a party who timely files a proposed plan. RCW 26.09.181(1)(d) provides:

> A party who files a proposed parenting plan in compliance with this section may move the court for an order of default adopting that party's parenting plan if the other party has failed to file a proposed parenting plan as required in this section.

Hurtado fails to show that Root's failure to timely file her proposed parenting plan renders the final parenting plan void.

Hurtado also contends that the child support order is void because Root failed to provide financial documentation. This contention is not supported by the record. Root provided Hurtado with her financial information when she served the motion for temporary orders on January 7, 2013, and he signed the agreed temporary order of child support and child support worksheets that identified both parties' incomes. On December 10, 2013, attorney Clark e-mailed to Hurtado and Drake the witness and exhibit list, trial brief, and Root's financial declaration. Root also provided evidence of her income and financial declaration at trial. While Hurtado could have contested this evidence, his failure to appear at trial prevented the court from considering his input before entering the final orders.

Hurtado further contends that the dissolution decree is void because Root failed to reveal the existence of a prenuptial agreement and her ownership interest in a corporation. These assertions are not supported by the record. According to attorney Levy's declaration in opposition to Hurtado's motion to vacate, based up on his review of the marriage documents filed in Mexico, there was no such prenuptial agreement.

Hurtado does not point to any evidence to the contrary.[34] Nor does Hurtado support his assertion that Root had an ownership interest in the corporation for which she worked; he simply cites her testimony that she was employed there.

*Order to Enforce the Temporary Parenting Plan*

Finally, Hurtado challenges the court's order enforcing the temporary parenting plan, entered on August 22, 2013. He contends that because he was not personally served with the motion to enforce the temporary parenting plan, the court had no authority to enter an order granting the motion. Thus, he asserts, the August 22, 2103 order granting the motion and the October 17, 2013 judgment for attorney fees and sanctions relating to that order are void as a matter of law. We disagree.

While personal service is required for a contempt motion,[35] the same is not true for the motion to enforce the temporary parenting plan. In fact, that is precisely why Root pleaded this motion in the alternative, realizing that personal service might not be possible.[36] Service by mail of the motion to enforce the temporary parenting plan was sufficient under the rules.

CR 5 addresses service and filing of pleadings and other papers, providing that "[e]xcept as otherwise provided in these rules, every order required by its terms to be served, every pleading subsequent to the original complaint, . . . every written motion other than one which may be heard ex parte . . . shall be served upon each of the

---

[34] He simply asserts that "Ms. Root did not reveal the existence of the prenuptial agreement she and Mr. Aguilar entered into," without citation to the record. Appellant's Br. at 19.

[35] LFLR 17(a)(2).

[36] The trial court declined to rule on the contempt motion for lack of service.

parties.[37] The rule further provides that "[s]ervice upon the attorney or upon a party shall be made by delivering a copy to him *or by mailing it to him at his last known address.*"[38] If service is by mail, proof of service is required.[39] The rule also provides that for service on nonresidents who have no attorney in the action, "the service may be made by mail if his residence is known."[40] Here, Root sent the motion to Hurtado at his last known address via first class certified mail and provided proof of service, satisfying the rule's requirements for proper service.[41]

Nor is there any merit to Hurtado's argument that service was insufficient under the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (Hague Convention on Service).[42] Article 1 of the Hague Convention on Service provides that it applies in all cases "where there is occasion to transmit a judicial or extrajudicial document for service abroad." If the Hague Convention on Service applies, its provisions preempt inconsistent methods of service prescribed by state law.[43] "Service" refers to "a formal delivery of documents that is

---

[37] CR 5(a).

[38] CR 5(b)(1) (emphasis added).

[39] CR 5(b)(2)(B).

[40] CR 5(b)(3).

[41] Root also e-mailed attorney Drake, although service on Drake was not required because he never entered a notice of appearance in the case or indicated that he was licensed in Washington to represent Drake. In fact, Root's attorney informed Hurtado at the outset that "unless he is licensed to practice law in Washington state, he can't actually formally represent you here. . . . [H]e can't appear in court or sign any orders on your behalf." CP at 128.

[42] Nov. 15, 1965, T.I.A.S. No. 6638.

[43] Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 699, 108 S. Ct. 2104, 100 L. Ed. 2d 722 (1988).

legally sufficient to charge the defendant with notice of a pending action."[44] Sufficiency of delivery is measured by the law of the forum state.[45] But Article 10(a) also provides that if "the State of destination does not object, the present Convention shall not interfere with (a) the freedom to send judicial documents, by postal channels, directly to persons abroad."

In International Transactions, Ltd v. Embotelladora Agral Regionmontana S.A. de C.V., the court recognized that "Mexico is a signatory to the Hague Convention and Mexico did not make an outright objection to Article 10(a), which allows service of process by mail."[46] There, the plaintiff wanted to sue a Mexican entity and served the Texas Secretary of State, which forwarded service of process on the Mexican entity via registered mail. The court concluded that service of process was proper under the Texas long-arm statute and comported with the Hague Convention on Service.[47] Similarly here, service by mail of the motion to enforce the temporary parenting plan complied with both Washington law and the Hague Convention on Service.

Moreover, Hurtado had already been personally served with the petition for dissolution in Washington and participated in the Washington dissolution proceedings. Thus, the service rules in Washington govern.[48] Accordingly, the court had the authority

---

[44] Id. at 700.

[45] Id.

[46] 277 F. Supp. 2d 654, 662 (N.D. Texas 2002),

[47] Id. at 663.

[48] Both International Transactions and the case cited by Hurtado address the sufficiency of service to initiate an action against a foreign entity that could not be personally served in Washington, which was not the case here. See Broad v. Mannesmann Anlagenbau, A.G., 141 Wn.2d 670, 10 P.3d 371 (2000).

to rule on the motion. The order granting the motion to enforce the temporary parenting plan and judgment relating to that order are not void.

We affirm.

WE CONCUR: