# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| JEFFREY T. CLOSSON, | No. 54031-2-II |
| Respondent, | (consolidated with No. 54138-6-II) |
| v. | |
| ELIZABETH J. KELSEY, | |
| Appellant. | |
| LISA L. GANOWSKI, | (and consolidated with |
| Respondent, | No. 54021-5-II and No. 54148-3-II) |
| v. | |
| ELIZABETH J. KELSEY, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, A.C.J.—Jeffrey T. Closson and Lisa L. Ganowski lived next door to Elizabeth J. Kelsey and Clayton Longacre. Relations between the neighbors were tense. When Closson returned Longacre's puppy one night after it had wandered into his and Ganowski's yard, Kelsey threatened to shoot Closson if he came onto her property again. There was also an incident involving smoke bombs set along the fence line and smoke drifting into Closson and Ganowski's home. The trial court granted Closson and Ganowski antiharassment protection orders against Kelsey.

We hold that the trial court did not abuse its discretion in issuing antiharassment protection orders. There is sufficient evidence in the record to support the trial court's findings of fact, and its findings support its conclusions of law. The trial court did not abuse its discretion in awarding costs and attorney fees to Closson and Ganowski. We affirm and award Closson and Ganowski costs and attorney fees on appeal.

FACTS

I. BACKGROUND

Kelsey moved into her home in Bremerton in November 1998. Clayton Longacre lived with Kelsey. As of 2019, Kelsey owned three small dogs, and Longacre owned four other dogs, including a young black Labrador retriever.

In January 2017, Ganowski moved into the house next door. Ganowski described being "woken up with [Kelsey] screaming profanities" and getting frustrated when Kelsey's dogs would defecate in Ganowski's yard and "bark in the middle of the night." 1 Verbatim Report of Proceedings (VRP) at 51-52.

Tensions between the two households escalated in February 2019. They argued over whether Ganowski's son had shoveled snow onto Kelsey's property, and Kelsey admitted that she shouted profanities at Ganowski.

A.    Threats to Shoot Closson

Closson moved in with Ganowski in April 2019. On June 13, 2019, Closson went over to Kelsey's house to return Longacre's black lab puppy that had gotten into their yard. Ganowski took a video of the exchange because she wanted "proof that [they] weren't doing anything wrong." *Id.* at 70.

2

The video, which the trial judge viewed, shows that Closson approached Kelsey's home, holding the dog in his arms, and rang the doorbell. In a second video, Closson said from the front porch, "This is Jeff, your neighbor. I've got this little black lab. She's come into our -- our yard a couple times." Ex. 1. Kelsey asked, "Are you that neighbor over there?" *Id.* When Closson answered, "Yeah," Kelsey responded, "Oh, you're terrible." *Id.*

Closson handed the dog to Kelsey, said "oh, really?" and turned to walk away. *Id.* As the two got further apart, they began to raise their voices. Closson said that Kelsey's dogs had been coming over into their yard, while Kelsey accused Closson and Ganowski of dumping snow into her yard. Kelsey also accused Ganowski of harassing her. She then yelled more loudly, "Don't you ever f***ing come onto my property again, or I'll shoot your motherf***ing a** you hear me? . . . You hear me, a**hole?" *Id.*

In a third video, Kelsey yelled, "Come on my property again, threaten my dog, and I'll f***ing shoot you." *Id.* Closson asked, "Did I threaten your dog?" *Id.* Kelsey continued, "And I'll f***ing shoot you, b**ch." *Id.* The video ended with the following exchange:

Closson:     Okay
Kelsey:      And I'll shoot you, b**ch.
Closson:     Alright.
Kelsey:      You want a war, you got a war.

*Id.* Closson made a noise at the end of the video that sounded like "huh." *Id.*

Closson called 911 that night and informed dispatch that it was not an emergency but he wanted to report the incident. Bremerton police contacted Closson and Ganowski and reviewed the videos. The responding officer "advised [he] would be writing a report for Harassment charges against Kelsey. [He] advised [Closson and Ganowski] to attempt to obtain an order against her." Exs. to Clerk's Papers (Exs.) at 94.

The next day, June 14, 2019, Closson and Ganowski filed petitions for antiharassment protection orders against Kelsey in the Bremerton Municipal Court. The court issued temporary protection orders.

B.    Smoke Bombs Incident

Cindy Hjelmaa, another neighbor, saw smoke blowing onto Ganowski's property on July 20, 2019 and took a video. In the video, Hjelmaa stated, "It looks like there's a smoke bomb that's coming, obviously, from the house next to [Ganowski's], just on the other side of the fence. It's been going on for about five minutes now, and it's white smoke, and it's been consistent." Ex. 1. Later she stated, "It looks like white smoke bombs, and it looks like it's not a -- not a barbeque, and not a fireplace, and something that is ongoing and deliberate." *Id.*

In a second video, Hjelmaa stated that it was "five minutes later," so there had been approximately ten minutes of "continuous, white smoke coming from the house next to [Ganowski's]." *Id.* She described the smoke as "filtering over to [the neighbors'] decks." *Id.*

When Closson and Ganowski returned home, Closson called 911 to report that there was not an emergency but their house was "full of smoke." Ex. 2. He called 911 again later that night to report that Kelsey had "an open fire going right next to [their] fence." *Id.* The fire department responded and reported that they "arrived to a person having a safe, controlled, recreational fire in a [chiminea]." Exs. at 76.

Closson and Ganowski then filed new petitions for antiharassment protection orders. These petitions added details about the smoke bombs and fire and repeated that Kelsey had threatened Closson. Both Closson's and Ganowski's petitions also incorporated their prior petitions.

4

Closson's petition explained, "I am afraid [Kelsey] will kill me or my girlfriend." Clerk's Papers (CP) at 21. Ganowski's petition similarly stated, "I am afraid [Kelsey] will become so angry she kills me or my boyfriend." Suppl. Clerk's Papers (SCP) at 117. Both petitions checked the boxes requesting that the court "[r]equire the respondent to pay fees and costs of this action, which may include administrative court costs and service fees and petitioner's costs including attorneys' fees." CP at 20; SCP at 116.

The Bremerton Municipal Court granted temporary protection orders and transferred the petitions to Kitsap County Superior Court for a hearing.

## II. SUPERIOR COURT HEARING

A.      Testimony

*Argument on the Porch:* At the hearing, the trial court viewed the videos described above. Ganowski testified that Kelsey's threats against Closson were what prompted her to petition for a protection order and explained that she "[t]ook it as a direct threat to [herself] as well." 1 VRP at 66. She told the court, "It terrified me. . . . I have no idea what they had for weapons. . . . But the way that she screams at people and me, I didn't -- I was very afraid that she would actually shoot us." *Id.* at 72. Closson also testified that his confrontation with Kelsey "really rattled [him], considering [he] had never spoken to her before and [has not] spoken to her since." *Id.* at 130. He said, "That [was] the only conversation I had with her when I was returning her dog, you know, in my mind doing her a favor [and her response] was basically to threaten to shoot me multiple times." *Id.* He told the court, "I believe that's the first time I've ever called 911 was on that day. Because of how scared I was." *Id.* at 132.

Kelsey's testimony about the argument on her porch contradicted Closson's and Ganowski's. Kelsey testified that she was in the shower when she heard Closson "yelling through the front door. You need to leave. You need to leave the neighborhood now and swearing." *Id.* at 170. She said that the videos did not include "all that was said" and that they cut out "a whole bunch of interaction where [she] told [Closson] what [Ganowski] had been doing." *Id.* at 172. She also said that during the argument, Closson would start to walk away and "then he'd run back to the door, which scared [her]." 2 VRP at 194.

Kelsey apologized for threatening to shoot Closson, saying, "I was scared. I was in my home by myself. And as I came down the stairs I didn't even recognize this man." 1 VRP at 173. She explained that her threats to shoot were "[i]n the context of [Closson] coming back over onto [her] property." *Id.* at 175. She further explained, "I was taught when someone's scaring you, to try to be bigger so that you don't get attacked. . . . They're at my front door. I'm not at their front door." 2 VRP at 225.

*Smoke Incident:* Ganowski testified that after the smoke bomb incident, their house was "all sulfur smelling." 1 VRP at 79. It "didn't smell like wood from a fireplace. It smelled like fireworks or something. . . . It just smelled rotten." *Id.* Closson agreed and told the court, "I'm familiar with what smoke bombs are from when I was a kid. It was definitely the smell of a smoke bomb or something similar to it." *Id.* at 134-35. Hjelmaa testified that she observed the smoke blow toward Closson and Ganowski's home for about 20 minutes, but when the wind changed direction and began blowing the smoke toward Kelsey's home, the smoke stopped.

Ganowski and Closson also testified that later that night, Kelsey came out onto her deck and commented "something like you shouldn't leave that poor dog alone" or "you better be careful

about that poor dog being there." *Id.* at 80, 136. Ganowski said, "[I]t felt like a threat that she knew I had a dog in the house and she knew the windows were open and she could see them and it was a deliberate attempt to hurt my dog. It was very upsetting to me." *Id.* at 80. Closson said, "I took it distinctly as a threat based on the only other conversation I had ever had with her was a threat to my life . . . . like you better not leave your house or bad things will happen." *Id.* at 136.

Kelsey and Longacre testified that the only fire they lit on their property that night was in their chiminea. Longacre believed this fire created a lot of smoke because there was debris in it, which "smelled, like, old leaves." 2 VRP at 263. Kelsey told the trial court that she had not touched smoke bombs since she was a child because her sister was burned by one. Kelsey also said that the only comment she made about Ganowski's dog was in a private conversation with Longacre and that she never threatened the dog.

*Black Lab Puppy:* With respect to the black lab puppy continuing to come onto their property, Closson said, "I don't know that they are teaching the dog to come over and do that, but they know that the dog is doing this and they continue to let it happen." 1 VRP at 146. Videos admitted into evidence showed the black lab puppy coming into Closson and Ganowski's back yard, coming into Closson and Ganowski's house, and taking a shoe. Ganowski testified that she contacted animal control about the dog "[20] or 30 times." *Id.* at 60. Closson and Ganowski filed two declarations with Kitsap Animal Rescue and Enforcement detailing multiple instances when the black lab puppy had come onto their property and caused damage during August and September 2019.

Kelsey testified that the puppy belonged to Longacre, that he had been working to train the puppy, and that he had been setting up baby gates along the fence to try and keep the puppy inside

their yard. Longacre testified that he owned the black lab puppy but he had recently decided to place the dog in another home "because of the problems that [they had] been having." 2 VRP at 247.

B.        Trial Court's Ruling

The trial court did not enter written findings of fact or conclusions of law, but it thoroughly explained its decision in an oral ruling. On the issue of the threats, the trial court found that Closson's version of the events was "extremely credible" and Kelsey was not credible. *Id.* at 313. The trial court rejected Kelsey's testimony that the videos were incomplete, and it found no basis for Kelsey's assertions that she was afraid. The video showed Closson "peaceably" returning the black lab puppy, and "Mr. Closson did nothing whatsoever to instill any fear or anything else in Ms. Kelsey or anyone." *Id.* at 314.

The trial court found that Kelsey "immediately lit into" Closson, asking him if he lived next door and then going into an "absolute tirade, complaining about everybody in the house next door." *Id.* The trial court recited that Kelsey threatened to shoot Closson several times, cursed at him repeatedly, and was "totally out of control." *Id.* at 315. Although these threats were directed at Closson in person, "in the Court's view they were directed to Ms. Ganowski and anybody else that was living in the Ganowski house." *Id.*

The trial court concluded that "the threats and [Kelsey's] tone . . . and aggression and violence, and profanity was -- quite remarkable." *Id.* at 316. "Obviously, on the tape Mr. Closson was completely stunned by it. . . . He's testified that he's been in fear as a result of that. It's been on their mind, and Ms. Ganowski did [testify to that] also." *Id.*

8

The trial court also found that the use of smoke bombs had been established by circumstantial evidence. It cited Hjelmaa's videos and observations, the sulfuric smell that remained when Closson and Ganowski returned home, which Closson recognized as a smell associated with smoke bombs due to his prior experience, and the testimony that Kelsey had said Closson and Ganowski "shouldn't leave [their] poor dog home alone like that." *Id.* at 317. The trial court concluded that the smoke bombs were set off "by or with the aid of Ms. Kelsey" and that this act was "done against both Mr. Closson and Ms. Ganowski." *Id.* at 317-18. The trial court did not find that the fire in the chiminea was an issue.

The trial court concluded that "based on the threats that were made June 13th to Mr. Closson, and the smoke that was done on July 20th, [it] would find that Ms. Kelsey committed unlawful harassment." *Id.* at 319. It found that the threats were sufficient to support issuance of antiharassment orders because they involved "knowing and willful" conduct, "the threats would cause any reasonable person substantial emotional distress," and the threats "did cause both [Closson and Ganowski] substantial emotional distress." *Id.* at 320-21. It further found that "the course of conduct [constituting harassment on June 13] was the entire tirade" because it included multiple threats and that although the smoke bombs were not violent or as threatening, that incident met "the elements of unlawful harassment together with the threats of June 13th." *Id.* at 321. It granted Closson and Ganowski's petitions "as a consequence of those two things." *Id.*

The trial court then addressed the issue of the black lab puppy "as an aside." *Id.* at 322. The trial court stated that "the black lab coming over to the house continuously, over and over and over again, and digging holes, chewing up shoes, pooping in the yard, and all that over a period of time . . . the depth [and] the breadth of that, I would consider that to be harassment." *Id.* The trial

9

court further explained that "in conjunction with the threat, [the black lab puppy's behavior] was alarming. Because here you have these people that as far as they know they may get shot if they touch this animal, let alone try to bring it home. And so . . . they don't do that anymore." *Id.* at 323. Even though Longacre owned the dog, "in the context" of Kelsey and Longacre living together, the trial court "would also find that the series of events with the black lab was unlawful harassment by Ms. Kelsey." *Id.* at 324.

The trial court granted Closson and Ganowski's second petitions, which incorporated all of the allegations presented in their first petitions. Closson and Ganowski also requested reimbursement for $552 in costs and $11,375 in attorney fees. The trial court awarded the requested costs and $5,000 in attorney fees, explaining, "Based on the time that[] went into these, the time of trial, and everything else, I think [$]5,000 is reasonable." *Id.* at 335. It required Closson and Ganowski to evenly split this award and entered orders granting each of them $276 in costs and $2,500 in attorney fees.

Kelsey appeals the two antiharassment protection orders against her, as well as the order granting Closson's and Ganowski's requests for costs and fees.[1]

---

[1] Kelsey also designates the four temporary ex parte protection orders that were issued against her in her notice of appeal, but she fails to make any arguments specific to these orders. "'Only issues raised in the assignments of error . . . and *argued* to the appellate court are considered on appeal.'" *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wn.2d 654, 693, 15 P.3d 115 (2000) (alteration in original) (quoting *State v. Kalakosky*, 121 Wn.2d 525, 540 n.18, 852 P.2d 1064 (1993)).

ANALYSIS

I. ANTIHARASSMENT PROTECTION ORDERS

A.     Antiharassment Orders Generally

The court shall issue an antiharassment protection order if it "finds by a preponderance of the evidence that unlawful harassment exists." RCW 10.14.080(3).[2] "Unlawful harassment" is "a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, harasses, or is detrimental to such person, and which serves no legitimate or lawful purpose." RCW 10.14.020(2).

A "course of conduct" is "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose." RCW 10.14.020(1). The requirement that the respondent engage in a "course of conduct" means "that it is the *series* of acts that, when combined, serve to sufficiently alarm, annoy, or cause detriment such that the definition of harassment is met." *State v. Haines*, 151 Wn. App. 428, 436, 213 P.3d 602 (2009). "The course of conduct shall be such as would cause a reasonable person to suffer substantial emotional distress, and shall actually cause substantial emotional distress to the petitioner." RCW 10.14.020(2).

"In determining whether the course of conduct serves any legitimate or lawful purpose," the trial court considers several factors, including whether "[a]ny current contact between the parties was initiated by the respondent only or was initiated by both parties," whether [t]he

---

[2] In 2021, the legislature repealed chapter 10.14 RCW, finding that "in order to improve the efficacy of, accessibility to, and understanding of, civil protection orders, the six different civil protection orders in Washington state should be included in a single chapter of the Revised Code of Washington." ENGROSSED SECOND SUBSTITUTE H.B. (ESSHB) 1320, 67th Leg., Reg. Sess., § 1(7) (Wash. 2021). However, ESSHB 1320 does not significantly change the substance of Washington's civil harassment law.

respondent's course of conduct appears designed to alarm, annoy, or harass the petitioner," whether "[t]he respondent is acting pursuant to any statutory authority, including but not limited to acts which are reasonably necessary to . . . [p]rotect property or liberty interests," and whether "[t]he respondent's course of conduct has . . . the purpose or effect of creating an intimidating, hostile, or offensive living environment for the petitioner." RCW 10.14.030(1), (3)-(5).

We review the trial court's issuance of antiharassment orders for an abuse of discretion. *See Trummel v. Mitchell*, 156 Wn.2d 653, 669, 131 P.3d 305 (2006). "[A]n abuse of discretion involves the unreasonable or arbitrary exercise of authority or the exercise of authority based on untenable grounds." *Ledgerwood v. Lansdowne*, 120 Wn. App. 414, 423, 85 P.3d 950 (2004). The relief granted "must be warranted by the facts." *Trummel*, 156 Wn.2d at 668.

"This court does not weigh evidence. We will uphold the trial court's findings of fact if they are supported by substantial evidence." *Ledgerwood*, 120 Wn. App. at 423 (citation omitted). "Substantial evidence exists when the record contains evidence of sufficient quantity to persuade a fair-minded, rational person that the declared premise is true." *State v. Askham*, 120 Wn. App. 872, 883, 86 P.3d 1224 (2004). "We defer to the trier of fact on the persuasiveness of the evidence, witness credibility, and conflicting testimony." *In re Vulnerable Adult Petition for Knight*, 178 Wn. App. 929, 937, 317 P.3d 1068 (2014) (part published). The trial court's factual findings must support its legal conclusions, which we review de novo. *Ledgerwood*, 120 Wn. App. at 423-24.

Both the Washington Supreme Court and this court have reviewed the issuance of civil antiharassment orders based on the trial court's oral ruling where the trial court did not enter written findings of fact or conclusions of law. *See Trummel*, 156 Wn.2d at 657-58; *Price v. Price*, 174 Wn. App. 894, 900-01, 301 P.3d 486 (2013). In addition, the trial court did not designate

expiration dates on the antiharassment orders at issue in this case, but they presumably expired in September 2020. *See* RCW 10.14.080(4) ("An order issued under this chapter shall be effective for not more than one year unless the court finds that the respondent is likely to resume unlawful harassment of the petitioner when the order expires."). However, Kelsey's appeal of the orders is not moot. She asks this court to remove the orders from her record due to the "'continuing stigma,'" and we have the authority to grant her requested relief. Appellant Kelsey's Opening Br. at 29 (quoting *Hough v. Stockbridge*, 113 Wn. App. 532, 537, 54 P.3d 192 (2002), *reversed in part on other grounds*, 150 Wn.2d 234, 76 P.3d 216 (2003) (per curiam)).

B.      Threats

Kelsey first argues that her threats to shoot Closson cannot constitute harassment against Ganowski because she "had no idea that Ganowski was present or listening." *Id.* at 36. She also argues that the trial court erred in finding unlawful harassment because the threat was not enough to cause a reasonable person substantial emotional distress and the threat did not actually cause Closson substantial emotional distress. Additionally, Kelsey contends that the trial court erred by finding the threats did not serve any legitimate or lawful purpose because she did not initiate the contact and she only wanted Closson to leave her property after he had come over at night when Kelsey was "alone and in a state of undress." *Id.* at 39.

Unlawful harassment requires "a knowing and willful course of conduct *directed at a specific person*." RCW 10.14.020(2) (emphasis added). The knowing and willful element goes "to the identity of the targeted victim," in addition to the conduct itself. *Burchell v. Thibault*, 74 Wn. App. 517, 522, 874 P.2d 196 (1994). Someone who "just happened to be in the company of" a person at whom harassment was directed cannot generally prove harassment. *Id.* However, "courts

have broad powers to address harassing conduct," and this includes the power to protect a group of people when the entire group is threatened. *Trummel*, 156 Wn.2d at 664.

Here, although Kelsey's threats were directed at Closson, their conversation escalated after Closson identified himself as Kelsey's next-door neighbor, and Kelsey specifically referenced Ganowski during the altercation. The conversation involved an argument about previous disputes between the two households, including a snow shoveling incident before Closson moved in, and Kelsey said that Ganowski's household was "psycho" and had been harassing Kelsey "since they moved in." Ex. 1. This evidence supports the trial court's finding that Kelsey's threats, in addition to being directed specifically at Closson, "were directed to Ms. Ganowski and anybody else that was living in the Ganowski house." 2 VRP at 315. Ganowski did not "just happen[] to be in the company of" Closson when the harassment occurred. *Burchell*, 74 Wn. App. at 522.

Kelsey also challenges the trial court's findings that Closson and Ganowski reasonably suffered "substantial emotional distress" as required under RCW 10.14.020(2). Substantial evidence must support the finding of substantial emotional distress, but testimony that the petitioner "felt threatened" may be enough to satisfy this standard. *Askham*, 120 Wn. App. at 884.

There is ample evidence in the record that these threats actually caused Ganowski and Closson substantial emotional distress. Ganowski testified that the incident "terrified" her because she had "no idea what [Kelsey and Longacre] had for weapons" and she was "very afraid that [Kelsey] would actually shoot [them]." 1 VRP at 72. Closson testified, "[I]t really scared me. It really rattled me, considering I had never spoken to her before and haven't spoken to her since." *Id.* at 130. Both Ganowski's and Closson's petitions stated they were afraid Kelsey would kill them. These statements established substantial evidence of subjective fear. And the trial court did

not abuse its discretion in concluding that their fear was reasonable, especially in light of the unprovoked nature of the threats.

Finally, Kelsey challenges the trial court's determination that her conduct served no legitimate or lawful purpose. The trial court watched the video of the confrontation and heard testimony from both Closson and Kelsey. It found that Closson's review of the events was "extremely credible," whereas Kelsey's was not. 2 VRP at 313. "We defer to the trier of fact on the persuasiveness of the evidence, witness credibility, and conflicting testimony." *Knight*, 178 Wn. App. at 937.

Kelsey is correct that Closson initiated this contact and that she is entitled to protect herself and her property. However, the trial court also had to consider whether her conduct appeared "designed to alarm, annoy, or harass" and whether it created "an intimidating, hostile, or offensive living environment." RCW 10.14.030(3), (5). The trial court here found that Closson was "peaceably" returning Longacre's puppy and that he did "nothing whatsoever to instill any fear . . . in Ms. Kelsey." 2 VRP at 314. It also found that "the threats and [Kelsey's] tone . . . and aggression and violence, and profanity was . . . quite remarkable." *Id.* at 316. Kelsey testified that her perspective at the time was, "I'm afraid and I don't know the guy. And I was taught when someone's scaring you, *to try to be bigger* so that you don't get attacked." *Id.* at 225 (emphasis added). Kelsey's own testimony corroborated the trial court's finding that she was attempting to alarm and intimidate Closson.

Regardless of how Kelsey felt during the interaction, the evidence in the record is sufficient to support the trial court's finding that Kelsey's response exceeded what was legitimate and lawful under the circumstances. In sum, substantial evidence supported the trial court's findings that

15

Kelsey threatened Closson and Ganowski, that they experienced reasonable fear, and that her threats were not legitimate and lawful. The threats supported the entry of antiharassment orders.

C.      Smoke Bombs

Kelsey next argues that there was insufficient evidence to support an antiharassment order based on the smoke bombs because there was no evidence that she was responsible for lighting smoke bombs or that the smoke was directed at Closson and Ganowski. She claims that "discrepancies and omissions" in Closson, Ganowski, and Hjelmaa's statements would "lead any reasonable person to question whether substantial evidence supports the Court's finding." Appellant Kelsey's Reply Br. at 11. She also challenges whether the remnants of the smoke and its odor would be sufficient to cause substantial emotional distress.

"This court does not weigh evidence." *Ledgerwood*, 120 Wn. App. at 423. The question on appeal is whether the trial court's factual findings were supported by substantial evidence, meaning whether "the record contains evidence of sufficient quantity to persuade a fair-minded, rational person that the declared premise is true." *Askham*, 120 Wn. App. at 883. The record here contains a video showing white smoke, Hjelmaa's testimony describing the duration and direction of the smoke, Closson and Ganowski's testimony describing the lingering smell of the smoke, and testimony that Kelsey threatened Closson and Ganowski's dog. This evidence is sufficient to persuade a fair-minded and rational person that Kelsey was involved in lighting smoke bombs and that the smoke bombs were lit when the wind was blowing toward Closson and Ganowski's house.

The trial court ruled that the smoke bombs incident "wasn't as violent, [or] as threatening, but . . . it meets the elements of unlawful harassment *together with the threats of June 13th*." 2 VRP at 321 (emphasis added). The trial court granted Closson and Ganowski's petitions "as a

16

consequence of *those two things*." *Id.* (emphasis added). It did not abuse its discretion in ruling that the smoke bombs incident—when considered alongside the threats made approximately one month earlier—was part of a pattern of harassment and intimidation by Kelsey that reasonably caused substantial emotional distress. The trial court did not err by considering these incidents to be a series of acts, or a course of conduct, that combined to constitute unlawful harassment.

D.      Black Lab Puppy

Kelsey also argues that the trial court erred by issuing antiharassment orders based on the black lab puppy's behavior. Whether the black lab puppy's behavior can be characterized as part of a knowing and willful course of conduct by Kelsey is debatable. But regardless, the trial court was clear that it issued antiharassment orders based on the threats and the smoke bombs incident, not the puppy's behavior. *See id.* ("[J]ust for those two things [the threats and the smoke bombs], . . . I would find Ms. Kelsey committed unlawful harassment. And as a consequence of those two things, the most recent petition of both Ms. Ganowski and Mr. Closson would be granted."). Therefore, we affirm the trial court's orders granting the antiharassment petitions. We need not reach Kelsey's arguments that the trial court erred by characterizing the puppy's behavior as harassment by Kelsey.

II. ATTORNEY FEES

A.      Attorney Fees Below

Kelsey next argues that the trial court erred when it awarded costs and attorney fees without giving her "the opportunity to review and contest them." Appellant Kelsey's Opening Br. at 39. She suggests that Closson and Ganowski failed to comply with CR 54(d) because, she says, they requested the fees orally and CR 54(d) requires that claims for attorney fees be made by motion.

17

We hold that proceedings under chapter 10.14 RCW are special proceedings created by the legislature and, therefore, it is permissible for petitioners to request costs and attorney fees in their petitions rather than by a separate motion.

CR 81(a) states, "Except where inconsistent with rules or statutes applicable to special proceedings, these rules shall govern all civil proceedings." The civil rules do not define "special proceedings," but the Supreme Court has described them as "proceedings created or completely transformed by the legislature," including actions "unknown to common law" and actions where the legislature has "entirely changed the remedies available." *Putman v. Wenatchee Valley Med. Ctr., P.S.*, 166 Wn.2d 974, 982, 216 P.3d 374 (2009).

Although no court has addressed whether proceedings for antiharassment orders under chapter 10.14 RCW are special proceedings, Division Three has held that proceedings for domestic violence protection orders are special proceedings. *Scheib v. Crosby*, 160 Wn. App. 345, 352, 249 P.3d 184 (2011). Division Three reasoned that "the [Domestic Violence Prevention Act, chapter 26.50 RCW,] replaces the common law injunction, to the extent that domestic violence protection becomes an adjunct of the common law injunction, with the statutory remedy of a domestic violence protection order." *Id.*

Similarly, the antiharassment protection order is a statutory remedy that did not exist in common law. *See* Aaron H. Caplan, *Free Speech and Civil Harassment Orders*, 64 HASTINGS L.J. 781, 790 (2013) ("The advent of domestic violence restraining orders -- which combined elements of pre-existing criminal and tort laws with the enforceability of an injunction -- gave rise to modern civil harassment statutes."). The Washington Legislature created this remedy in 1987. *See* RCW

10.14.040 ("There shall exist an action known as a petition for an order for protection in cases of unlawful harassment.").

Because the legislature statutorily created the remedy of the antiharassment order, we hold that proceedings for antiharassment orders are special proceedings under CR 81(a) and that, to the extent the civil rules are inconsistent with chapter 10.14 RCW, the statutory provisions of chapter 10.14 RCW govern.

With chapter 10.14 RCW, the legislature "intended to provide victims with a speedy and inexpensive method of obtaining civil antiharassment protection orders preventing all further unwanted contact." RCW 10.14.010. To achieve this goal, the legislature asked the administrative office of the courts to develop "a single master petition pattern form for all antiharassment and stalking protection orders." RCW 10.14.800(1); *see also* RCW 10.14.050. It also directed all court clerks to "make available simplified forms and instructional brochures" and to provide these materials "free of charge." RCW 10.14.040(3)-(4).

Kelsey cites to CR 54(d)(2), which provides that claims for attorney fees and expenses "shall be made by motion." However, in developing the master petition pattern form for antiharassment orders that the legislature expressly required, the administrative office of the courts included a section permitting the petitioner to request costs and attorney fees by simply checking a box. This effectuated the legislature's intent of providing petitioners with "a speedy and inexpensive method" of obtaining protection. RCW 10.14.010. To the extent CR 54(d)(2) conflicts, chapter 10.14 RCW governs, and a separate motion is not required.

RCW 10.14.090(2) provides, "The court may require the respondent to pay the filing fee and court costs, including service fees, and to reimburse the petitioner for costs incurred in bringing

the action, including a reasonable attorney's fee." The decision to award costs and reasonable attorney fees is within the trial court's discretion. *See* RCW 10.14.090(2) ("The court *may* require the respondent to pay." (emphasis added)); *see also Hough*, 113 Wn. App. at 543 ("The trial judge had the discretion not to order fees, and we will not disturb that ruling."). The statute does not require that the trial court enter findings to support its decision.

Closson and Ganowski checked the box requesting costs and attorney fees on their petitions. They requested $552 in costs and $11,375 in attorney fees. At the hearing, Kelsey argued that they did not have a basis for requesting such substantial attorney fees from her. The trial court reviewed the statute and awarded the requested costs and approximately half of the requested attorney fees—an amount which it determined was reasonable. Kelsey has not shown that the trial court abused its discretion in reaching this determination. Therefore, we affirm the trial court's order granting reimbursement for costs and some attorney fees.

B.    Attorney Fees and Costs on Appeal

Finally, Closson and Ganowski argue that under RCW 10.14.090(2) and RAP 18.1(a), they are entitled to additional costs and attorney fees on appeal. RAP 18.1(a) provides for the recovery of reasonable attorney fees on appeal if "applicable law grants to a party the right to recover reasonable attorney fees or expenses on review" and the party properly requests it. "If attorney fees are allowable at trial, the prevailing party may recover fees on appeal." *Scheib*, 160 Wn. App. at 353.

RCW 10.14.090(2) allows for the trial court to "require the respondent . . . to reimburse the petitioner for costs incurred in bringing the action, including a reasonable attorney's fee." Therefore, this court has discretion to award fees and costs pursuant to RCW 10.14.090(2) and

No. 54031-2-II

RAP 18.1(a). We award Closson and Ganowski costs and attorney fees on appeal in an amount to be determined by a commissioner of this court.

CONCLUSION

We hold that the trial court did not abuse its discretion in granting Closson's and Ganowski's petitions for antiharassment protection orders based on Kelsey's threats and the incident involving smoke bombs. The trial court did not abuse its discretion in awarding Closson and Ganowski costs and reasonable attorney fees below. We affirm and award Closson and Ganowski costs and attorney fees on appeal.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, ACJ
Glasgow, A.C.J.

We concur:

Cruser, J.

Veljacic, J.